**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No. 14-cv-2798-RBJ-MEH**

REBECCA TRUJILLO,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
A. PEREZ, RN
V. TOLIVER, RN,
DANA WIMBERLY, RN,

      Defendants.

_____

**MOTION FOR SUMMARY JUDGMENT**
_____

      The Nurse Defendants – Anthony Perez, RN, Victoria Toliver, RN, and Dana

Wimberly, RN – by undersigned counsel of record, respectfully present their motion for

summary judgment and, as grounds, state as follows.

      **Certification regarding conferral:** No conferral is required by D.C.COLO.LCivR

7.1 as this is a dispositive motion brought under Fed. R. Civ. P. 56.

      **I.    Introduction.**

      Plaintiff brought a section 1983 case alleging delay in treatment during her

incarceration in the Denver jails (Denver County Jail and Van Cise-Simonet Detention

Center) from April 2012 to May 2013.  Plaintiff alleges that on "July 4, 2012 she was

cleaning the floor in a common room when the cord of the buffer got stuck under the

buffer, which twisted her body around, causing her to severely injure her spine and fall

to the ground." Am. Comp., Doc. 99, ¶ 38.  Plaintiff alleges that the "severe injury" to

her spine made her an appropriate candidate for cervical spine surgery, which she did

not receive until after she was released from jail during May 2013.  Am. Comp., Doc. 99,

¶¶ 72-73.  Plaintiff contends a delay in scheduling her for surgery amounted to cruel and

unusual punishment under the Eighth Amendment to the Constitution of the United

States.

**II.      Statement of Undisputed Material Facts.**

1.      On August 9, 2011, Plaintiff was incarcerated at the Denver County Jail

and submitted a written request for medical assistance, stating: "Need to be seen for

inflammation on the top of my left foot, my left ankle, the side of my left hand, and both

of my knees.  I am worried that I have an infection."  She was documented by the Nurse

to have "swelling present [at] [left] knee, hand, foot, [patient] able to ambulate, does not

disturb any of [patient's] daily activities."  She was referred to see a doctor on the MDL

(Medical line).  **Exhibit A,** Inmate Request for Medical Assistance (8/9/2011).

2.      An August 17, 2011 Progress Noted by Dr. Stob states, "[bilateral] feet

and ankle swelling, started ~ 2 months ago, getting worse over the last two weeks."

**Exhibit B,** Progress Note (8/17/2011).

3.       On January 25, 2012, Plaintiff requested medical assistance, stating, "I

have hands knees and feet very swollen from Rheumatoid Arthritis was taking B-12,

Antacid, in September also want to check if I'm Diabetic need to see Rheumatology."

**Exhibit D,** Inmate Request for Medical Assistance (1/25/2012).

4.      On February 2, 2012, Plaintiff was seen by a doctor who noted, "[history

2

of] diffuse joint pain and [positive] Rheumatoid factor.  Was referred to Rheum in

8/2011, released, patient states no follow up when released."  She was prescribed B12,

Folate, compression stockings, and referred to the Rheumatologist.  **Exhibit E,**

Progress Note (2/2/2012).

5.      On April 30, 2012, at the beginning of a new period of incarceration, a

Health Services Questionnaire was completed for Plaintiff by a Nurse at the Van Cise-

Simonet Detention Center (Downtown Detention Center or DDC).  **Exhibit C,** Health

Services Questionnaire (4/30/2012).

6.      The Nurse Defendants were employees of Denver Health and Hospital

Authority – a political subdivision of the state of Colorado – during Plaintiff's

incarceration in the Denver jails, April 30, 2012 to May 14, 2013.

7.      During her April 30, 2012 interview, she told the Nurse "she has

rheumatoid arthritis but has yet to start medications for it."  She was assigned a bottom

bunk.  **Exhibit C,** Health Services Questionnaire, p. 2 (4/30/2012).

8.      On May 3, 2012, Plaintiff was again seen by the doctor who noted,

"[patient] known to me.  [History of] diffuse joint pain [with positive Rheumatoid factor.]

Has been referred to Rheum but released x 2.  Today came back to clinic and will be

here for 'awhile'… mild joint swelling [no] obvious deformities noted.  [Assessment /

Plan] Diffuse joint pain [from positive Rheumatoid factor], Re-refer to Rheum, will add

NSAID."  Plaintiff was prescribed Naproxyn, B12, and folic acid.  **Exhibit F,** Progress

Note (5/3/2012).

9.      On May 10, 2012, Plaintiff[1] was evaluated by a Rheumatologist at Denver Health Medical Center, and his impression was "This is a good story for an early inflammatory arthritis with symmetrical small joint pain and swelling." **Exhibit G,** Clinic Note (5/10/2012). "She is a 46-year-old woman who has had arthritis for about a year and a half. She complains of symmetrical small joint pain and swelling that occurs in the knuckles and her hands, in her knees and across the balls of her feet. She has recently developed deformities in her feet that she thinks is unusual and more than normal. She has an okay time functioning, although a hard time doing very physical labor." **Exhibit G,** Clinic Note (5/10/2012).

10.     On July 4, 2012, Plaintiff again requested medical assistance, stating, "I have severe numbness on my hands and knees feet not sure of Rheumatoid Arthritis but I can hardly walk fell in the bathroom pain hasn't stopped." She also stated to the Nurse, "I have severe arthritis and it's been getting worse. I have fallen 5-6 times already. I am in a lot of pain." **Exhibit H,** Inmate Request for Medical Assistance (7/4/2012). The Nurse who evaluated Plaintiff noted that she was using a walker, had obvious deformities, reported 8/10 pain, and stated, "I can't even grip anything." Plaintiff was given ibuprofen and scheduled to see the doctor on 7/12/2012.

11.     A Progress Note dated July 6, 2012 indicates that a Nurse saw Plaintiff having difficulty walking and gave her a walker. **Exhibit I,** Progress Note (7/6/2012).

---

[1] Plaintiff is identified in the record for this visit as Rebecca Mondragon. The Hospital Return Assessment dated 5/10/2012 confirms she did indeed see the Rheumatologist that day, **Exhibit HH,** Hospital Return Assessment (5/10/2012), the age of the patient is the same (46), and there is no clinic note associated with the name Rebecca Trujillo from that date. Additionally, Plaintiff's jail medical director expert testified he spoke with her about the clinic note and confirmed it was hers. **Exhibit CC,** Deposition of Plaintiff's Medical Director Expert, Kennon Tubbs, M.D., p. 47:1-11.

12.    A Progress Note dated July 9, 2012 states, "[Subjective] [inmate] states fell earlier – hit her chin on someone's shoe, [no] redness, swelling – no abrasions noted on chin – using walker since 7/6/12 – [patient] seen on kite line for previous falls… complains of [right] hand arthritis – slightly swollen around thumb – [Assessment] falls, unsteady gate, [ambulates with] walker."  Plaintiff was moved to building 4, which is the medical unit at the Denver County Jail.  **Exhibit J,** Progress Note (7/9/2012).

13.    On July 12, 2012, the doctor noted, "housed in building 4 [medical unit] fall risk [secondary] to [Rheumatoid Arthritis] [patient] states seen by Rheum @ [Denver Health] (records reviewed and no visit found)[2] multiple Denver Cares visits… Deformity noted [bilateral] hands and feet, ambulates with walker, [Assessment / Plan] chronic pain [secondary to] [Rheumatoid Arthritis], will refer to Rheum….  [Increase] Neurontin, continue Motrin, avoid Tylenol [secondary to] Hep C and [alcohol] abuse, clear for [general population] will have [follow up] with McGann for lab review."  **Exhibit K,** Progress Note (7/9/2012).

14.    A Progress Note dated July 11, 2012 indicates the sheriff deputies reported to a nurse during medication rounds that Plaintiff was having much difficult with activities of daily living, had feces all over herself, was unable to clean herself and required sheriff deputy assistance in the shower and needed much direction and instruction on care for herself.  Plaintiff was reported to be unsteady, even with a walker, and was noted to be at a high risk for falling.  **Exhibit L,** Progress Note (7/11/2012).

15.    On July 23, 2012, Dr. McGann conducted a follow up lab review, changed

_____

[2] This is likely because the 5/10/2012 visit was under the name Rebecca Mondragon and not in the records for Rebecca Trujillo.

the Flexeril prescription, referred Plaintiff to the nurses for information about obtaining copies of her medical records for her family, and scheduled an appointment with Dr. Stob regarding an anticipated follow up appointment with Rheumatology at Denver Health Medical Center. **Exhibit M,** Progress Note (7/23/2012).

16.     On July 25, 2012, Plaintiff was assessed by a non-party Nurse and Plaintiff stated, "I feel like I'm having a stroke" and "relates symptoms to new med" (Flexerel).  The Nurse assessed her as stable and planned to continue monitoring her in the medical unit where she was housed. **Exhibit N,** Progress Note (7/25/2012).

17.     Also on July 25, 2012, a Progress Note indicates Plaintiff had been falling multiple times but was keeping it from the officers and other inmates reported it. **Exhibit O,** Progress Note (7/25/2012).

18.     On July 27, 2012, Plaintiff was again assessed by Dr. McGann, who discontinued Flexeril, ordered continued housing in the medical unit, and encouraged Plaintiff to ambulate daily with assistance. **Exhibit P,** Progress Note (7/27/2012).

19.     After staff expressed concerns about the medical unit being the appropriate housing for Plaintiff, she was scheduled to be transferred to the medical unit at the Downtown Detention Center (DDC), which can provide infirmary level care if necessary and where doctors are present onsite every weekday. **Exhibit Q,** Progress Note (7/26/2012); **Exhibit GG,** Deposition of Carmen Kassatly p. 11:19 – 12:13 (5/23/2017).

20.     On July 28 and 29, 2012 at the DDC, Plaintiff was found by Defendant Nurse Perez sitting on the floor next to the toilet – she said she slipped down – and then

sitting on the floor next to her bed.  Plaintiff denied injury both times and was instructed to use the call light for assistance transferring.  **Exhibit R,** Progress Note (7/28-29/2012).

21.     On August 1, 2012, Plaintiff was evaluated by Dr. Crum who noted, "[Patient] seen.  Vague persistent complaints of numbness with changing story.  Stated week 20 "stroke."  Given walker, now [wheelchair], for ?  [Rheumatoid Arthritis] despite [no diagnosis].  No falls noted.  Several "slips" [without] any injury.  Unclear malingering vs. other…. Known [three] times [with] Stob.  Refer to Stob MD for next available eval." **Exhibit S,** Progress Note (8/1/12).

22.     On August 10, 2012, Plaintiff was seen by a Rheumatologist at Denver Health Medical Center (the same Rheumatologist who had seen her on May 10, 2012 under a different name and patient ID number, opining at that time that "this is a good story for an early inflammatory arthritis with symmetrical small joint pain and swelling"), and he amended his opinion to be that she did not have rheumatoid arthritis symptoms and referred her to Neurology.  **Exhibit T,** Consultation Report (8/10/2012).

23.     On August 13, 2012, Dr. Stob evaluated Plaintiff and spoke with the Rheumatologist and referred Plaintiff to Neurology.  **Exhibit U,** Progress Note (8/13/2012).

24.     On September 12, 2012, Plaintiff was seen by a Neurologist at Denver Health Medical Center, who recommended an MRI.  **Exhibit V,** Clinic Note (9/12/2012).

25.     On October 10, 2012, an MRI was performed at Denver Health Medical Center.  The radiologist's Impression was "Mild nonspecific high T2 signal white matter

foci, somewhat greater than expected for the patient's age. The distribution is not typical for multiple sclerosis. More likely considerations include old trauma or chronic small vessel ischemic change. No evidence of acute infarct." **Exhibit W,** Radiology Consultation Report (10/10/2012).

26. From July 25, 2012 until October 21, 2012, Plaintiff did not submit any Inmate Requests for Medical Assistance forms.

27. On October 21, 2012, Plaintiff submitted a request for medical assistance stating, "I need to see mental health my medications aren't working. Since I've had a loss in my family I'm really depressed and I'm having a hard time sleeping can I see you A.S.A.P. please, thank you." **Exhibit X,** Inmate Request for Medical Assistance (10/21/2012).

28. Plaintiff's next Inmate Request for Medical Assistance form is dated December 11, 2012 and it reads, "My meds were helping me I'm hoping I can continue taking what I had. Thank you." **Exhibit Y,** Inmate Request for Medical Assistance (12/11/2012).

29. Plaintiff's next Inmate Request for Medical Assistance form is dated January 13, 2013 and it states, "My legs and hands are hurting. Please can I see Dr. Hugh the Neurologist, need a follow up please." **Exhibit Z,** Inmate Request for Medical Assistance.

30. On February 13, 2013, Plaintiff was seen by a Neurologist at Denver Health Medical Center. His Assessment states, "This is a 46-year-old woman with likely chronic cervical stenosis exacerbated by trauma with T2 signal in the spinal cord at

multiple levels in the cervical spine.  I personally reviewed the MRI of the cervical spine and brain myself and confirm these findings.  At this time, we would be interested in initiating a Medrol dose pack to give her some symptomatic relief as well as refer her on neurosurgical evaluation in clinic to see if she would be amenable to surgical correction at this time.  She has no need for further follow up in neurology should neurosurgery deem this to be a worthwhile endeavor." **Exhibit AA,** Clinic Note (2/13/2013).

31.    On May 14, 2013, Plaintiff was released from jail.

32.    On May 16, 2013, she presented to the urgent care clinic at Denver Health Medical Center.  She was assessed by an orthopedic surgeon who recommended surgery to correct cervical spine instability and stenosis. **Exhibit BB,** Consultation Report (May 16, 2013).

33.    The surgery was successfully performed on May 22, 2013.

**III.    Legal Standard.**

 "Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. ***Neal v. Lewis***, 414 F.3d 1244, 1247 (10th Cir. 2005); Fed.R.Civ.P. 56.  It is not a disfavored shortcut, but rather is an integral part of the rules. ***Celotex Corp. v. Catrett***, 477 U.S. 317, 327 (1986).  Once the moving party shows the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to establish a genuine issue of material fact. ***Vitkus v. Beatrice Co.***, 11 F.3d 1535, 1539 (10th Cir. 1993).  Vague, conclusory and self-serving statements do not create a genuine issue of material fact. ***Ford v. West***, 222 F.3d 767, 777 (10th Cir. 2000).  "Conclusory allegations, general denials, or mere

argument of an opposing party's case cannot be utilized to avoid summary judgment."

***Pasternak v. Lear Petroleum Exploration, Inc.***, 790 F.2d 828, 834 (10th Cir. 1986).

In interpreting the evidence and drawing all reasonable inferences in favor of the non-

moving party, *see **Celotex v. Catrett***, 477 U.S. 317, 322-23 (1986), the Court need not

accept the non-moving party's conclusions of law or application of law to the facts of the

case.  See ***Olpin v. Ideal National Insurance Company***, 419 F.2d 1250, 1255 (10th

Cir. 1969).

IV.    **Legal Argument.**

The Nurse Defendants are entitled to summary judgment in their favor for each of

the following independently sufficient reasons: (A) Plaintiff lacks required expert

evidence to prove medical causation; (B) Plaintiff cannot show that the Nurse

Defendants acted with deliberate indifference to her serious medical needs; and (C) the

Nurse Defendants are entitled to qualified immunity.

A.  **Plaintiff has no required medical causation evidence and therefore summary judgment must be granted in favor of Defendants.**

Defendants are entitled to summary judgment in their favor because Plaintiff fails

to present required medical causation evidence to show that the delay in performing

surgery caused substantial harm.  "[D]elay in medical care only constitutes an Eighth

Amendment violation where the plaintiff can show that the delay resulted in substantial

harm."  ***Sealock***, 218 F.3d at 1210 (internal quotation marks and citation omitted).  In

this type of case, where Plaintiff does not blame defendants for the alleged July 4, 2012

fall but instead blames them for not obtaining the proper treatment sooner, medical

expert testimony is required to establish that a defendant's conduct caused Plaintiff's alleged injuries.  *See Mathison v. United States,* 2015 WL 854476, at *2-3 (D. Colo. Feb. 26, 2015), citing *Franklin v. Shelton,* 250 F.2d 92, 97 (10th Cir. 1957) ("In the Tenth Circuit, 'where injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, they must be proved by the testimony of medical experts.'"); *see also Duke v. Garcia,* 2014WL1333151, at *3 (D.N.M. Feb. 28, 2014) (plaintiff failed to designate an expert witness to prove the defendant officers caused her foot injury and, "given the uncertainty and complexity surrounding [her] alleged injury, this is not an exceptional circumstance where medical causation is within common experience or knowledge of the layman."); *McCarthy v. Wienberg,* 753 F.2d 836, 839 (10th Cir. 1985) (in deliberate indifference case involving alleged improper treatment of progression of multiple sclerosis, "[t]he factual, medical issues involved are complex, requiring the presentation of expert opinion.").

Plaintiff alleges that the later determined need for cervical spine fixation surgery should have been determined sooner and, if it had, she would have been better off. This case involves what the spine surgeon refers to as a "semi-urgent" procedure and, therefore, the impact of a delay in surgery involves the type of specialized medical knowledge that only a specialist in the area of spine surgery can properly address. **Exhibit JJ,** Clinic Note (8/12/2014).  In other words, this is not a case where sudden emergent symptoms made it plain to anyone that surgery was required.  Instead, Plaintiff had a workup for similar symptoms thought to be arthritis-related and she

affirmatively reported arthritis and a desire to rule out diabetes.  Additionally, the fact the

Rheumatologist and the Neurologists Plaintiff saw at Denver Health Medical Center did

not admit her to the hospital shows that Plaintiff's condition was such that some delay

was reasonably permissible.[3]  To the extent speculation can be avoided at all, the

impact of the delay is thus the domain of a specialist in the area.  But Plaintiff has no

evidence that if cervical spine surgery had been performed sooner, she would have

obtained a better health outcome and thus would have avoided any substantial harm.

Plaintiff's doctor expert, Kennon Tubbs, M.D., recorded a telephone conversation

he had with Plaintiff for the purpose of forming his opinions in this case.  The topic of

medical causation was addressed and he stated as follows:

> **Dr. Tubbs:** Okay.  So a month goes by and you saw the neurologist, right?
> **Ms. Trujillo:** Right.
> **Dr. Tubbs:** And you saw him in September [2012].  What did he tell you?
> **Ms. Trujillo:** Nothing serious.  I think that if he would have allowed to have been on this matter at the time that I did see him I was probably be more able to keep up with my two-year old grandson and be more normal had I been had that surgery done at that time.
> **Dr. Tubbs:** Okay, but that is all speculation.  I want to know what the neurologist told you when you saw him in September.
> **Ms. Trujillo:** That nothing.
> **Dr. Tubbs:** Did he tell you that something serious was going on or that this is not

---

[3] Plaintiff's orthopedic spine surgeon testified as follows: Q. And in your opinion, just based on your experience here at Denver Health Medical Center, could Dr. Boyle have referred [Plaintiff] up to the emergency department on the date he saw her, August 10, 2012 if he deemed it appropriate?  Ms. Custer: Object to form and foundation.  A. Yes, I believe he could.  Q. (BY MR. SINGER) And when Dr. Hughes saw Ms. Trujillo during September 2012, is it your understanding, based on your training and experience, that he could have referred her up to the emergency department right here in the same building if he deemed it appropriate? A. I believe he could have, yes. Q. And with regard to Dr. Maa, in February 2013, if he had determined it was appropriate to refer Ms. Trujillo up to the emergency department in this very same building as the CCMF here at Denver Health Medical Center, he could have done that on that date, correct? A. Yes. **Exhibit II,** Deposition of Dr. Vanderheiden pp. 111:8 – 112:14.

serious?
**Ms. Trujillo:** To me it felt like it was not serious to him.

**Exhibit EE,** Transcript of Tubbs/Trujillo Conversation, pp. 3-4.   Plaintiff's retained medical expert opined it would be "all speculation" to say Plaintiff would be "more normal" had surgery been performed during September 2012 rather than May 2013.[4]

Moreover, the orthopedic spine surgeon who performed Plaintiff's spinal fusion surgery testified as follows:

> **Q. What I wanted to ask you, isn't it correct that if Ms. Trujillo had surgery in October 2012, it's reasonably possible that she would have had the same outcome in terms of her clinical presentation after surgery?**
> **Ms. Custer:** Object to form, foundation.  Incomplete hypothetical.
> **A.** It is possible, yes.
> **Q. And if she had surgery in October of 2012, it's reasonably possible that she could have had the same non-union condition that she ended up having, correct?**
> **A.** Correct.

**Exhibit FF,** Deposition of Dr. Vanderheiden, p. 115:2-14.

Plaintiff has not disclosed any qualified medical opinion to show that delay of surgery caused any harm.  Expert medical causation evidence is required for Plaintiff to prove her claim.  *See **Mathison,*** 2015 WL 854476 at *2-3; ***Franklin,*** 250 F.2d at 97; ***Duke,*** 2014WL1333151 at *3; ***McCarthy,*** 753 F.2d at 839.  Accordingly, Plaintiff fails to present a viable claim for trial and summary judgment must be granted in favor of Defendants.

> **B.  Plaintiff cannot prove the subjective component of her deliberate indifference claim and, therefore, summary judgment must be**

---

[4] Although Dr. Tubbs, as a family practice doctor, is not qualified to testify concerning orthopedic spine causation, the fact he candidly acknowledges the speculative nature of such an unqualified opinion supports the Defendants' position that Plaintiff lacks required expert evidence in the area of causation.

**entered in favor of the Defendant Nurses.**

As the claimant in this civil action, Plaintiff bears the burden of showing by a preponderance of the evidence that her Eighth Amendment right to be free from cruel and unusual punishment was violated. *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010) ("In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment.").  The deliberate indifference analysis is the same for pretrial detainees as for convicted prisoners. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *Lopez v. LeMaster*, 172 F.3d 756, 759 n. 2 (10th Cir. 1999).  Accordingly, in order to prevail under this claim, the law requires Plaintiff to establish, by a preponderance of the evidence, that the alleged medical mistreatment involved the following objective and subjective components:

> (1) Objectively:  the medical condition involved must be sufficiently serious to rise to the level of constitutional protection[5]; and

> (2) Subjectively:  the prison official possessed a "sufficiently culpable state of mind" to have inflicted cruel and unusual punishment.

*See Self v. Crum*, 439 F.3d 1227, 1230-31 (10th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 839 (1994)).  "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks and citation omitted).  Additionally, "delay in medical care only constitutes an Eighth

---

[5] The Supreme Court has characterized this as "the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834, 839 (1994).

Amendment violation where the plaintiff can show that the delay resulted in substantial harm." *Id*. at 1210.

To prove the subjective component, the prisoner must show that the health care provider had a "sufficiently culpable state of mind," so as to be guilty of "subjective recklessness" in having "consciously disregard[ed]" the substantial risk of serious harm. *Farmer*, 511 U.S. at 834, 839.   Stated differently, the plaintiff must establish that the defendants knew she faced a substantial risk of harm and disregarded that risk by failing to take reasonable steps to abate it.   *Hunt v. Uphoff*, 199 F.2d 1220, 1224 (10th Cir. 1999); *Farmer*, 511 U.S. at 847.   "A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment.   At most, it is medical malpractice, and, as such, the proper forum is the state court…" *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

Plaintiff lacks evidence to show that any one of the Nurse Defendants consciously disregarded her medical needs.   While Plaintiff must prove that the alleged delay in medical care resulted in substantial harm, *see Sealock*, 218 F.3d at 1210, and this relates to the objective component of the deliberate indifference standard, the Nurse Defendants addressed Plaintiff's lack of causation evidence above and assume for purposes of this part of the legal argument that her medical need was objectively serious.   Given a serious medical need, Plaintiff must now present evidence that Nurses Toliver, Wimberly, and Perez knowingly disregarded her needs so as to inflict cruel and unusual punishment.   Plaintiff has no such evidence.

The record shows the Defendant Nurses reasonably provided for Plaintiff's

serious medical needs, and Plaintiff lacks evidence to show deliberate indifference on their part.   Importantly, it is outside the scope of the nursing function to *diagnose* medical conditions and *prescribe* treatment.   Plaintiff disclosed a jail medical director, Dr. Kennon Tubbs, to testify as a retained expert in this case.   Dr. Tubbs testified as follows:

> **Q. What is the general scope of a nurse's practice in correctional care in your experience, specifically with regard to jails?**
> **A.** So nurses are required to make assessments. Nursing plans, care plans. Do vital signs. Do physical examinations and intake physicals. When patients come in to booking and they get an intake physical examination.  They can do assessments, and then report to a physician. They can obtain laboratory evaluations and do simple laboratory tests like urinalysis, blood draws, IVs, administer medication, follow physician and physician assistants direct medical orders, or take medical records.  Transcribe them.  I mean, the scope of nursing is vast. I ask my nurses to do a lot of different things.  The one thing I don't ask them to do is diagnose.
> **Q. You --**
> **A.** Or prescribe.
> **Q. Okay.**
> **A.** The function of a physician is to diagnose and prescribe. The function of the nurse is to provide care that has been recommended by the medical doctor or a physician assistant.

**Exhibit CC,** Deposition of Plaintiff's Medical Director Expert, Kennon Tubbs, M.D., pp. 19:11 – 20:17.   Because Plaintiff's claim turns on an alleged unconstitutional delay in properly diagnosing her cervical spine condition and prescribing surgical treatment, and the Defendant Nurses cannot be held responsible for failure to diagnose or prescribe (as defined by Plaintiff's own physician expert for this case), the claims against the Defendant Nurses in their individual capacities are unavailing.

Additionally, Plaintiff disclosed a nurse expert, Janet Grametbauer, RN, to offer opinions critical of the Defendant Nurses, but Nurse Grametbauer has no opinion about

the mindset of the Defendant Nurses.

**Q Do you have any opinions regarding the thought process of any of the nurses that you've been critical of with regard to the circumstances giving rise to this case?**
**MR. GRAY:** Object to form. You can answer if you understand.
**BY MR. SINGER: Q Do you understand the question?**
**A** Yes, I believe I did. The only one note I had was note where there was a question of she was malingering. And I couldn't read the signature on that, so I believe it was a nurse's note.[6]
**Q You say that -- this is with regard to Nurse Perez on the second bullet point: "Her failure to perform an in-depth chart review and assessment directly contributed to the long delay in the diagnosis of Ms. Trujillo's spinal cord injury."  And my question is, how did -- in your opinion, your opinion is Ms. Perez or Nurse Perez failed to perform an in-depth chart review, how did that directly contribute to the delay of a diagnosis?**
**A** Well, if you look at the medical record, you can see that she started off 7/4, 7/6. And if Nurse Perez -- and she had fallen in the infirmary, so Nurse Perez was aware of that.  And in evaluating any injury from the fall would be -- there would be an assessment involved with that. And a reasonable and prudent nurse is going to pull that chart and go through and go all the way back to the beginning and say, okay, what's going on with this person, and look at her intake screening, look at her health assessment, look at everything and try and figure out what's going on with this -- with this patient. She's here in my infirmary now, she's fallen twice, she walked in.
**Q To follow up on my previous question, I had asked about the thought process of the nurses. And you referenced a note where you saw someone who you thought was a nurse describing possible malingering as an explanation for why Ms. Trujillo was presenting the way that she was presenting, correct?**
**A** Correct.
**Q Do you have any other opinions about the subjective intent or thought process of any of the nurses in this case?**
**MR. GRAY:** Object to form.
**THE WITNESS:** Other than nobody advocated, nobody did, you know, the appropriate assessments and stuff as far as what they were thinking, no. I know what they should have been thinking, but what they were thinking, I don't know.
**BY MR. SINGER: Q You're not claiming to know what was going through their heads, correct?**

**A** No.

---

[6] See statement of undisputed fact 21, above.  Nurse Grametbauer incorrectly attributes the note by Dr. Crum to a nurse at the jails.

> **Q You're not claiming that you knew -- you know what was going through these nurses heads and that's a basis for your opinion, correct?**
> **MR. GRAY:** Object to form. You can answer.
> **THE WITNESS:** As far as what they should have been thinking, what they should have been doing, but as far as what they were actually thinking, no.

**Exhibit DD,** Deposition of Plaintiff's Nursing Expert, Janet Grametbauer, RN, pp. 101:8

– 103:23. Similarly, Dr. Tubbs did not purport to have any knowledge of the mindset of

the Defendants Nurses:

> **Q.** You're not purporting to know what was going through any particular provider's head at any given time with relation to the circumstances out of which this case arises?
> **A.** Again, whenever I state in my report that I use the medical record to formulate many of my opinions, there's nothing in the medical record that helps me understand what the physicians were thinking at that moment. Both the nursing staff and the doctors do a poor job of documentation of what they were thinking at that time that would help me infer why they were doing what they were doing.

**Exhibit CC,** Deposition of Plaintiff's Medical Director Expert, Kennon Tubbs, M.D., p.

90:8 – 23. Plaintiff's own medical and nursing experts offer no evidence of subjective

intent or recklessness on the part of the Defendant Nurses. Plaintiff presents no other

evidence of any Defendant's subjective recklessness or indifference regarding serious

medical needs. Accordingly, Plaintiff cannot present a triable issue of a culpable state

of mind on the part of the Defendant Nurses, *see **Hunt v. Uphoff***, 199 F.2d 1220, 1224

(10th Cir. 1999); ***Farmer***, 511 U.S. at 847, and summary judgment must be granted in

their favor.

### C. The Defendant Nurses are entitled to qualified immunity.

Qualified immunity protects defendants not only from liability, but also from suit.

***Harlow v. Fitzgerald,*** 457 U.S. 800, 818 (1982). "Under the doctrine of qualified

immunity, government officials are immune from civil damages liability for constitutional

torts as long as their actions could have been thought consistent with the rights they are alleged to have violated." **Richardson v. Butler,** 12-CV-02912-REB-CBS (D.Colo. 2014)(citing *Anderson v. Creighton,* 483 U.S. 635, 638 (1987)).  Whether a defendant is entitled to qualified immunity is a question of law.  **Wilder v. Turner,** 490 F.3d 810, 813 (10th Cir. 2007).  Resolution of a dispositive motion based upon qualified immunity involves a two-pronged inquiry:

> (1) Whether the defendant violated a constitutional right; *and*

> (2) Whether the violated right was clearly established at the time of the defendant's alleged misconduct.

*See* **Quinn v. Young,** 780 F.3d 998, 1004 (10th Cir. 2015).  Either prong may addressed first.  **Estate of Lockett v. Fallin,** 841 F.3d 1098.  Since we are at the summary judgment stage, the plaintiff must make this demonstration on the facts alleged and must find factual support in the record.  **Quinn,** 780 F.3d at 1004, citing **Riggins v. Goodman,** 572 F.3d 1101, 1107 (10th Cir. 2009).

For a violated right to be clearly established, it must be found in Supreme Court or Tenth Circuit precedent, or from the weight of precedent from the other Circuits.  **Id.** citing **Weise v. Casper,** 593 F.3d 1163, 1167 (10th Cir. 2010).  Plaintiff bears the burden of pointing to the clearly established right in such case law, and clearly established law may not be defined at a high level of generality.  *See* **Id.** citing **Ashcroft v. al-Kidd,** 563 U.S. 731, 742 (2011).  General propositions such as that denial of medical care for a known serious medical need violates the Eighth Amendment or, broad historical assertions, such as that the Eighth Amendment protects inmates from denial of medical care for serious medical needs while incarcerated, are of little help and unavailing for

avoiding proper application of qualified immunity. *Al-Kidd,* 563 U.S. at 742.  The

contours of the right must be sufficiently clear from case law that a reasonable official

would have understood the what he is doing violates that right. *Id.* at 741.

In order to avoid summary judgment in favor of the Nurse Defendants, Plaintiff

must demonstrate that Nurses Toliver, Wimberly, and Perez should have known that an

inmate with Plaintiff's complaints is denied constitutionally mandated care by these

nurses when she is given a walker, housed in the medical unit, transferred to the

medical unit in the DDC with infirmary level care, evaluated by three medical doctors at

the jail, and sent for consults with rheumatology, neurology, and radiology physicians at

the hospital.  Moreover, Plaintiff must show that such a right was reasonably known to

each of these nurses in the context in which they had an opportunity to care for Plaintiff.

Plaintiff can make no such showing because each of the Nurse Defendants acted

reasonably and appropriately in their interactions with Plaintiff as her nurse.  There is no

evidence that any of these nurses violated Plaintiff's clearly established right, and the

Nurse Defendants must be granted qualified immunity.

### V.     Conclusion.

Summary judgment must be granted in favor of the Nurse Defendants for the

independently sufficient reasons that: (A) Plaintiff lacks required causation evidence to

show that any delay in surgery caused her substantial harm; (B) Plaintiff cannot show

the Defendant Nurses consciously or recklessly disregarded her serious medical need;

and (C) the Defendant Nurses are entitled to qualified immunity.

WHEREFORE, the Nurse Defendants respectfully request that the Court grant

their motion for summary judgment and dismiss them from the case.

Dated: June 26, 2017

_/s Patrick A. Singer_
Patrick A. Singer, 39738
Kresl & Johnson, P.C.
130 Rampart Way, Ste. 200
Denver, CO 80230
Phone: (303) 336-2100
Fax: (303) 388-1749
psinger@kresljohnson.com
_Counsel of record for Defendants,_
_A. Perez, RN; V. Toliver, R.N.; and_
_Dana Wimberly, RN_

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of June, 2017, a true and correct copy of the foregoing was filed to the Court and served by CM/ECF to the following:

Kathleen K. Custer
Jessica J. Smith
Tina Van Bockern
J. Lee Gray
Holland & Hart, LLP
Attorneys for Plaintiff

Conor D. Farley
Cristina Pena Helm
Denver City Attorney's Office, Litigation Section
Attorneys for Defendant,
City and County of Denver

_/s Patrick A. Singer_
Patrick A. Singer