**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-02798-RBJ-MEH

REBECCA TRUJILLO,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, et al.,

      Defendants.

---

**DEFENDANT CITY AND COUNTY OF
DENVER'S MOTION FOR SUMMARY JUDGMENT**

---

      Defendant, the City and County of Denver ("Denver"), by and through undersigned counsel, hereby moves for summary judgment pursuant to Fed. R. Civ. P. 56 and this Court's Practice Standards. In support thereof Denver states:

## I.    INTRODUCTION

      Plaintiff Rebecca Trujillo has asserted Eighth Amendment claims pursuant to 42 U.S.C. § 1983 against Denver and three individual nurses employed by Denver Health and Hospital Authority ("Denver Health") related to the medical care she received while incarcerated at the Denver County and City Jails from April 2012 through May 2013. [Doc. #99.] Specifically, Plaintiff alleges that Denver Health nurses Anthony Perez, R.N., Victoria Toliver, R.N., and Dana Wimberly, R.N. ("Nurse Defendants") denied Plaintiff of her Eighth Amendment right to adequate medical care. [Doc. #192., at pp. 1-2.] Plaintiff argues that Denver is indirectly liable for Denver

Health's allegedly constitutionally deficient policies, practices, and customs and/or failure to adequately train and supervise the nurses at the jail. [*Id.*] This is the sole cause of action against Denver in this lawsuit as no claim of direct liability against Denver survived Denver's Fed. R. Civ. P. 12(b)(6) Motion to Dismiss. [Doc. # 183, at pp. 20-21, 31.]

As discussed below, Plaintiff is unable to show that Denver or Denver through its contracted health care provider acted with deliberate indifference to the serious medical needs of its inmates. Therefore, Plaintiff's Eighth Amendment claim fails as a matter of law and Denver is entitled to summary judgment.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      At all times relevant to this lawsuit, Denver contracted with Denver Health to oversee and provide all correctional healthcare services to Denver's inmates, which are housed at the Denver County Jail (DCJ) and the Downtown Detention Center (DDC). [**Exhibit A**, Denver Health Rule 30(b)(6) Deposition, at 23:18 – 24:18; **Exhibit B**, Denver Health Policy J-A-02.]

2.      Denver Health is a political subdivision of the State of Colorado wholly separate and independent of Denver. [C.R.S. § 25-29-103(1), C.R.S. §§ 25-29-101(1)(e) & 25-29-106(1).]

3.      The Denver jail facilities have been accredited by the National Commission on Correctional Health Care (NCCHC) since 1982, including at all times relevant to the claims in this lawsuit, with on-site visits by NCCHC surveyors specifically tasked with evaluating the system for compliance with all NCCHC standards in 2011 and 2014. [**Exhibit C**, Jeffrey J. Alvarez, M.D. Rebuttal Report, at p. 9; **Exhibit D**, Deposition of Jeffrey Alvarez, M.D., at 94:2-16.]

4.      The NCCHC is widely viewed as the authority on jail medical care accreditation. [**Exhibit C**, at p. 9.] The NCCHC standards are appropriate for healthcare, and jails should strive

to meet that standard when possible. [**Exhibit E**, Deposition of Kennon Tubbs, M.D., at 168:14-18.] Specifically, "NCCHC standards are ideal" and correctional medical care providers "should all strive to practice within their standards." [*Id.* at 173:23 – 174:3.]

5.      Jail medical facilities accredited by NCCHC must continuously show compliance with its standards. [**Exhibit C**, at p. 9.)  In other words, "if you choose to be NCCHC certified, you need to follow their recommendations and their policies and procedures…[o]r you won't get accreditation." [**Exhibit E**, at 168:24 – 169:5.]

6.      Critical standards for accreditation include compliant policies on Access to Care (J-A-01), Continuous Quality Improvement (J-A-06), Emergency Services (J-E-08), Nursing Assessment Protocols (J-E-11), Continuity and Coordination of Care During Incarceration (J-E-12), and Infirmary Care (J-G-03). [**Exhibit C**, at p. 9.] Denver Health's Denver Sheriff Department Unit, which provides medical care at Denver's jails, has adopted these standards. [**Exhibits F-K**.]

7.      Nursing staff hired by Denver Health to work at Denver's jails are qualified to provide care to patients as they have gone through nursing school and taken a national exam. [**Exhibit L**, Denver Health Rule 30(b)(6) Deposition (Firebaugh), at 18:8-12.] All health care services staff at Denver's jails must have the necessary license or certificate as required by the State of Colorado and/or the federal government. [**Exhibit M**, Credentialing (NCCHC J-C-01).]

8.      All newly-hired Denver Health nursing staff receive a day of hospital orientation, civilian orientation through the Denver Sheriff Department regarding the correctional facilities, and a minimum of 12 shifts of on-the-job training on the floor where they're working side by side with another nurse. [**Exhibit L**, at 17:1-11.] Prior to starting on-the-job training, nursing staff are told where to access the Denver Health protocols, policies, and procedures. [*Id.* at 19:15 – 20:7.]

9.      The Denver Health policies and procedures on professional development and access to care are provided and discussed with new hires on the first day. [**Exhibit L**, at 31: 12 – 32:25.] New hires are also informed that all policies and procedures are available on the internal database (Pulse) and that if they have any questions to look there. [*Id.* at 33:10 – 35:3.]

10.     Denver Health also maintains protocols for different complaints that a patient may have to provide information related to symptoms, and questions that could be asked, and guidance on information to look for and treatment areas. [**Exhibit L**, at 22:3-19; **Exhibit N**, Denver Health Protocols Table of Contents.] The protocols are reviewed and updated regularly by the Denver Health medical director, with the updates distributed via email and at quarterly mandatory meetings for nurses, doctors, and administrative support. [**Exhibit L**, at 24:5 – 26:4.]

11.     Denver Health also holds skills fairs every year in which all nurses, doctors, and administrative support working in Denver Health's Denver Sheriff Health Services Division receive training related to their position. [**Exhibit L**, at 9:13 – 11:11.] This training is based on NCCHC and American Correctional Association (ACA) accreditation standards. [*Id.* at 12:8-17.] Someone within Denver Health with the pertinent experience trains new hires and the people who attend every year. [*Id.* at 13:11-14.]

12.     Every medical provider within the Denver Health's Denver Sheriff Health Services Division must demonstrate competencies on skills related to providing medical care. [**Exhibit L**, at 16:4-17.] The medical providers also take quizzes on the protocol book. [*Id.* at 16:18-25.] In addition to the initial orientation, medical providers must maintain 40 hours of yearly continuing education. [*Id.* at 15:16-19.]

13.     Recognizing that Denver Sheriff Department deputies are with inmates on a daily

4

basis and in close proximity in the event of an emergency, deputies are trained to recognize certain medical conditions and to relate this information to the medical staff. [**Exhibit O**, Training for Correctional Officers (NCCHC J-C-04).] This training includes first aid and basic CPR, and also recognition of the need for emergency care in life-threatening situations and of acute manifestations of chronic illnesses and adverse reactions to medications. [*Id.; see also* **Exhibit P**, Deposition of Deputy Kaipat-Jones, at 28:15-29:14.]

14.     When a deputy is concerned that an inmate is having an acute illness, that deputy is trained to alert the Denver Health medical staff. [**Exhibit H**.] Deputies are not asked to triage the inmates, but rather to place an emergency call to get Denver Health medical staff involved immediately. [**Exhibit L**, at 44:17 – 45:16.]

15.     Denver Sheriff deputies notify Denver Health medical staff when a deputy observes an inmate get injured, when an inmate reports an injury, or when the deputy observes an inmate acting in a way that the deputy thinks might be an injury even though it hasn't been reported. [**Exhibit P**, at 70:1 – 71:20.] Denver Sheriff Department personnel are required to report medical emergencies and, if necessary, they can call 9-1-1. [**Exhibit Q**, Denver Health Rule 30(b)(6) Deposition (Garcia), at 69:23 – 70:7.]

16.     At Denver's jails, Denver Health provides access to emergency services 24 hours a day, seven days a week to address health needs that cannot be deferred to the next sick call, with a medical physician and a psychiatrist on call at all times. [**Exhibit H**.]

17.     On July 4, 2012, Plaintiff claims she sustained an injury while operating a floor

buffer at the DCJ in which she twisted and fell.[1] [Doc. #99, at ¶ 38.] No Denver Sheriff deputy observed the alleged incident – the deputies were located down the hallway and around the corner from where Ms. Trujillo claims she fell. [**Exhibit R**, Deposition of Rebecca Trujillo, at 154:20 – 158:2.]  After the alleged incident, Ms. Trujillo walked to the end of the hallway and told the deputies, "I'm in pain. I don't think I'll be able to handle this job anymore." [*Id.* at 162:8-16.] In response, Ms. Trujillo was provided a medical kite and instructed to fill it out and return it back to receive medical treatment. [*Id.*, at 163:18-24; 165:8-12.]

18.     Medical kites are readily available to inmates at the DCJ; inmates can get medical kites on their own as they are provided in the dorms, and if those forms run out they will be provided by DSD deputies immediately upon request. [**Exhibit P**, at 72:18 – 73:2.]

19.     Plaintiff's July 4, 2012 medical kite was silent as to an incident with a floor buffer and claimed instead that she had numbness in her hands and feet – symptoms she attributed to rheumatoid arthritis – and that she had difficulty walking, resulting in a bathroom fall. [**Exhibit R,** at 164:11-20; **Exhibit S**, 7/4/2012 Inmate Request for Medical Assistance.]

20.     Plaintiff was seen by a nurse on July 6, 2012 in response to her kite. During her evaluation, Plaintiff again reported severe arthritis that was getting worse and that she had fallen 5-6 times. Plaintiff did not report any injury specific to a fall or report anything related to an incident involving operation of a floor buffer. [**Exhibit S**.]

21.     After the July 6, 2012 assessment, Plaintiff was seen by Denver Health Medical staff on July 9, 2012, for issues related to falls and difficulty walking. [Nurse Defendants' Motion

---

[1] Denver disputes such an incident occurred on July 4, 2012, but takes the allegation as true only for purposes of this Motion as the evidence concerning the alleged incident is disputed.

for Summary Judgment (Doc. #211), at Statement of Undisputed Material Facts ¶¶ 11-12; **Exhibit T**, 7/9/2012 DSD OIC Staff Report, at DENVER 0000024.]

22.      On July 9, 2012, Plaintiff was transferred to the medical unit at DCJ as a result of having fallen in the general population dorm.[2] [**Exhibit T**, at DENVER 000024 and DENVER 000033; **Exhibit Q**, at 68:12-16.]

23.      On July 11, 2012, DSD deputies reported to Denver Health nursing staff that Plaintiff was having difficulty with activities of daily living and needed assistance to shower and care for herself. [**Exhibit T**, at DENVER 000026; Nurse Defendants' Motion for Summary Judgment (MSJ) (Doc. #211)], at Statement of Undisputed Material Facts ¶ 14.] Plaintiff was assessed again by a Denver Health medical doctor on July 12, 2012. [*Id.*, at ¶ 13.]

24.      On July 16, 2012, Plaintiff was transferred back to general population in Building 21 at the DCJ. [**Exhibit T**, at DENVER 000033, **Exhibit Q**, at 68:17-21.]

25.      Plaintiff was examined by a Denver Health medical doctor on July 23, 2012, resulting in an update to pain medication and schedule a rheumatology appointment, and a Denver Health nurse on July 25, 2012, for symptoms she described as feeling like a stroke that she attributed to the new medication and for which she was assessed as stable. [Nurse Defendants' MSJ (Doc. #211), at Statement of Undisputed Material Facts ¶¶ 15-16.]

26.      On July 25, 2012, Plaintiff was placed again in the medical unit at DCJ. [**Exhibit T**, at DENVER 000033.] The next day, DSD Deputy Kaipat-Jones expressed concern regarding the DCJ medical unit being the appropriate housing for Plaintiff based upon Plaintiff's instability

---

[2] The DCJ has a medical unit (known as Building 4) that functions as sheltered housing to provide a protective environment for those inmates inappropriate for general population but do not require 24-hour nursing care. [**Exhibit K**; **Exhibit U**, Denver Health Rule 30(b)(6) Deposition (Kassatly), at 9:18 – 10:20.]

and need for assistance. [**Exhibit T**, at DENVER 000031.] In response to this notification by DSD Deputy Kaipat-Jones, and after an interview of Plaintiff by a Denver Health nurse and DSD personnel, it was determined that Plaintiff would be better cared for at the DDC due to her mobility and lack of safe movement. [*Id.*]

27.     On July 26, 2012, Plaintiff was transferred to the Medical Unit at the DDC (also known as "3 Medical" at the Denver Justice Center (DJC)) where she was housed throughout the remainder of her incarceration until May 14, 2013. [**Exhibit T**, at DENVER 000032; **Exhibit Q**, at 61:22-25.] The DDC medical unit is for sheltered housing, observation, and can meet significant health care needs, including infirmary level care. [**Exhibit K**; **Exhibit U**, at 9:18 – 10:20.]

28.     Between July 28, 2012, and May 14, 2013, Plaintiff received significant medical care, evaluation, and monitoring from the Denver Health nursing staff, medical doctors, and other providers at the DDC medical unit, and at offsite specialists and clinics. [Nurse Defendants' MSJ (Doc. #211), at Statement of Undisputed Material Facts ¶¶ 20-31.]

29.     All medical decisions are the sole responsibility of qualified healthcare personnel. [**Exhibit V**, Medical Autonomy (NCCHC J-A-03) DENVER 000513.] However, Denver Sheriff Department deputies are trained that they must alert a supervisor if they believe from a layperson's perspective than an inmate requires additional medical attention from the jail medical staff. [**Exhibit W**, Medical and Health Care Services, DENVER000506-512 at ¶ 5(C); *see also* **Exhibit P**, at 25:21 – 27:6.]

30.     Inmates submit medical kites through a secured kite box. [**Exhibit U**, at 109:8-18.] DSD deputies – and other Denver employees – do not have access to the medical records of inmates because they are HIPAA-protected records. [**Exhibit A**, at 79:1-21.]  When the paper

copies of an inmate's medical records are transported with the inmate to an offsite medical provider it is in a locked container that the DSD deputies cannot access. [*Id*. at 81:23 – 82:24.]

31.     Denver and its medical provider Denver Health have established a Continuous Quality Improvement (CQI) program to monitor and evaluate the process, substance, and outcomes of significant aspects of care on a continuous basis to provide high quality and appropriate health care services with the DSD facilities. [**Exhibit G**; **Exhibit X**, 2012 CQI Plan DENVER 000524-532.] This process includes medical chart audits with a minimum of 50 patient charts (25 from DCJ and 25 from DDC) audited each quarter. [**Exhibit U**, at 28:16 – 31:21.]

32.     Denver Health and Denver have also established a Utilization Management (UM) Committee to improve communication and information sharing among all involved in the delivery of health care services, including sharing statistical reports to show trends in the services being provided to the inmates and analysis to provide indicators for action to improve patient care. [**Exhibit Y**, Administrative Meetings & Reports (NCCHC J-A-04)**.**] The UM Committee meets monthly to review the UM reports. [**Exhibit A**, at 50:8-12.]  Accordingly, Denver Health reports monthly to Denver regarding medical service provided to the Denver jail population through UM reporting. [*Id.*, at 30:3-21.]

## III.     STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, discovery and declarations show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Where, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden of showing no genuine dispute of fact by identifying a lack of evidence with respect to an essential element of the nonmovant's claim. *See Adamson v.*

*Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). Once the moving party meets his initial burden, the burden then shifts to the non-moving party to demonstrate the existence of a genuine issue of material fact to be resolved at trial. *See Vitkus v. Beatrice Co.* 11 F.3d 1535, 1539 (10th Cir. 1993). Where municipal liability is alleged, to survive summary judgment, a plaintiff must show that she has evidence of specific facts which demonstrate that the governmental entity exhibited deliberate indifference towards her in its alleged failure to institute a proper policy and in not properly training and supervising its officers. *Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir. 1988); *Medina v. City and County of Denver*, 960 F.2d 1493, 1500 (10th Cir. 1992).

## IV.    ARGUMENT

### A. The Non-Delegable Duty Doctrine Does Not Provide a Cause of Action for Plaintiff to Impose Vicarious Liability Against Denver for Any Deficient Medical Care She May Have Received.

Under the non-delegable duty doctrine, "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *West v. Atkins*, 487 U.S. 42, 56 (1988). However, absent knowledge of a pattern of unconstitutional conduct by its medical contractor, a municipality meets its constitutional obligation to provide access to adequate medical care unless it has or should have notice of deficiencies in the medical care rising to deliberate indifference. *See DuBois v. Payne Cty. Bd. of Cty. Comm'rs*, 543 F. App'x 841, 849 (10th Cir. 2013) ("no evidence that any policy or custom of [the jail] was the moving force behind, or caused or enabled, [inmate's] suicide. Rather, the Jail had policies and practices in place to provide adequate medical care for all inmates. Those

10

policies were followed in [inmate's] case. Furthermore, the contract with [medical contractor] was intended to provide medical care on-site with trained and qualified medical personnel"); *see, e.g.*, *McPhail v. Cty. of Macomb*, No. 12-12134, 2014 WL 172275, at *6 (E.D. Mich. Jan. 15, 2014) ("the fact that County entered into the [contract] with [a private medical contractor] to provide health care services to the [county jail] inmates generally dictates a finding, as a matter of law, that the County was not deliberately indifferent to the medical needs of the [county jail] inmates and is entitled to summary judgment on a claim of deliberate indifference to a medical need") (citing *Graham v. Cty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004)); *Fisher v. Cty. of Macomb*, No. 2:08-CV- 13844, 2011 WL 2414413, at *9 (E.D. Mich. June 14, 2011) ("County cannot be held liable for the actions or omissions of [medical contractor's] staff or its policies.").

Critically, this lawsuit is distinguishable from *West* and the cases that have adopted its analysis because it involves two separate governmental entities, each with their own independent sources of "color of state law" authority, instead of a governmental entity contracting with a private actor. The critical rationale for the non-delegable duty was to bring a private physician contracted with a public entity under the color of state law to permit the remedy available under § 1983. *West*, 487 U.S. at 56. As Denver Health is a political subdivision of the state and is bound by the same rules, regulations, and constitutional obligations as Denver, that rationale does not apply. *See* C.R.S. §§ 25-29-103, 25-29-105, 25-29-106. Plaintiff was able to pursue her Eighth Amendment claim directly against Denver Health and any failure on Plaintiff's part to timely do so, without more, does not open Denver to imputed liability here.

However, even if the non-delegable duty is applied to Denver's relationship with Denver Health, it is still not a viable cause of action because there is no evidence of any actual or

constructive notice by Denver of any deficiency in medical treatment by Denver Health for inmates who received medical care, let alone evidence of notice by Denver of a policy, practice, or custom of such deficiencies that could give rise to deliberate indifference. The healthcare services provided by Denver Health to the Denver prisoner population has been evaluated and accredited by the NCCHC. *See* Statement of Undisputed Material Facts (SUMF), ¶¶ 1-4. Plaintiff's retained expert in the field of correctional medical care, Kennon Tubbs, M.D., has no criticism of Denver's retention of Denver Health to provide correctional healthcare services to its prisoner population and believes it was reasonable for Denver to contract with an NCCHC certified medical provider such as Denver Health for this purpose. [**Exhibit E**, at 192:22 – 194:8.] Denver and Denver Health have established Continuous Quality Improvement and Utilization Management programs to monitor and evaluate the medical outcomes of treatment and provide statistical data regarding trends in healthcare to the relevant stakeholders. *See* SUMF, ¶¶ 22-23. There is simply no evidence that any information existed to alert Denver to any alleged deficiency in the medical care. Even Plaintiff's correctional medical care expert admits he has no evidence to support a conclusion that Denver had notice or any reason to believe that Denver Health was allegedly not providing access to neurosurgery or other necessary spinal care. [**Exhibit E**, at 197:13-21.]

Moreover, medical conditions, complaints, and medical reporting from inmates – in the form of medical kites or medical records – are not generally accessible by DSD personnel. *See* SUMF, ¶ 21. DSD deputies are trained to report to a supervisor if they believe from a layperson's perspective that an inmate requires additional medical attention, but all medical decisions are the sole responsibility of qualified medical personnel.  *See* SUMF, ¶ 20.  In July 2012, deputies reported behavior and incidents they observed, or were informed of, related to potential health

concerns of Plaintiff, and Denver Health personnel consistently examined, evaluated, and determined the appropriate course of medical treatment during this time period. *See* SUMF, ¶¶ 15-18. There is no evidence that any DSD personnel had any additional unreported concerns, or any basis from a layperson's perspective to have concerns based upon Plaintiff's medical condition during July 2012, or the period of time she was housed at the DDC medical unit through May 2013.   Nor is there any evidence that reporting related to Continuous Quality Improvement or Utilization Management gave or should have given knowledge to Denver of any alleged deficiency in the medical care being provided to Plaintiff by Denver Health. Rather, Denver had every reason to believe that Plaintiff was consistently receiving care as necessary. [Nurse Defendants' MSJ (Doc. #211), at Statement of Undisputed Material Facts ¶¶ 20-31.]

Further, any later knowledge Denver may have potentially been able to obtain after the fact demonstrating that Plaintiff may not have received all of the care necessary for her condition is not sufficient to establish notice that Plaintiff was receiving inadequate medical care at the time she was actually receiving medical. "[B]asic principals of linear time prevent us from seeing how conduct that occurs after the alleged violation could have somehow caused that violation." *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009); *see also Moore v. Miller*, No. 10-cv-00651-JLK, 2014 WL 2207346, at *6 (D. Colo. May 28, 2014) ("[E]vents that postdate [plaintiff's] arrest are chronologically prevented from having provided the City with notice of the allegedly unconstitutional violations and may not serve as indicators of deliberate indifference."); *Casey v. City of Federal Heights*, No. 05-cv-01013-REB-KLM, 2008 WL 2559443, at *2 (D. Colo. June 23, 2008) ("It is logically impossible for an investigation that post-dates the alleged constitutional deprivation to have caused that deprivation."); F.R.E. 407. Therefore, in this case, no viable basis

exist for the application of the non-delegable duty doctrine to Denver

**B. Plaintiff's Attempt to Establish Municipal Liability Against Denver Based Upon the Policies Practices, and Customs of Denver Health Fails.**

Moreover, to establish municipal liability, Plaintiff must show: (1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313 (10th Cir. 1998) (citing *Monell v. Dept. of Social Serv.*, 436 U.S. 658, 694 (1978)). Local governments cannot be sued under a theory of *respondeat superior. Monell,* 436 U.S. at 691. Rather, under § 1983, a municipality is only liable for its own unconstitutional or illegal policies. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Therefore, to survive summary judgment, in addition to establishing her Eighth Amendment rights were violated, Plaintiff must also demonstrate: (1) a municipal policy or custom that caused her injury and (2) then demonstrate "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction*, 717 F.3d 760, 769 (10th Cir. 2013). Here, Plaintiff is unable to make such a showing.

**1. Plaintiff's Inability to Establish the Nurse Defendants Violated Her Constitutional Rights Requires Dismissal of Her Municipal Liability Claim.**

To sufficiently assert an Eighth Amendment violation, Plaintiff must show that Denver was deliberately indifferent to her serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A showing of deliberate indifference requires "both an objective and a subjective component." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). "Under the objective inquiry, the alleged deprivation [of care] must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994)). "[A] medical need is sufficiently serious if it is one…that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata*, 427 F.3d at 751.

The subjective prong of the test requires the plaintiff to present evidence of the prison official's state of mind, and is met only if "the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 837)). It is not enough for an official to merely be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; rather, the official 'must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S at 837). Allegations of mere negligence or "'an inadvertent failure to provide adequate medical care' does not rise to a constitutional violation." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Estelle*, 429 U.S. at 105-06).

Denver incorporates the statement of undisputed facts and legal argument contained in the Nurse Defendants' Motion for Summary Judgment (Doc. # 211) by reference herein with respect to the issue of Plaintiff's inability to establish that her constitutional rights were violated. To the extent that Plaintiff is unable to make such a showing, her claim against Denver also fails. *See City of Los Angeles v. Heller, 415* U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

### 2. Plaintiff Has Failed to Demonstrate That Any Policy, Practice, or Custom, or Failure to Train, Caused a Constitutional Violation.

Plaintiff's claim is based on a single, discrete circumstance in which she alleges that she was not provided with adequate medical care while she was incarcerated, which caused her injury and damages. Even if Plaintiff can demonstrate her Eighth Amendment rights were violated by

Denver Health Nurses, she cannot establish that any specific official policy, practice, or custom or failure to train was the moving force behind her constitutional injury. A municipal policy or custom may be a formal policy, an informal custom that develops into a well-settled practice, or deliberately indifferent training or supervision. *Schneider*, at 717 F.3d at 770; *see also Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (describing additional municipal policies or customs). Plaintiff has not alleged an officially promulgated policy caused the alleged constitutional violation; as a result, she must be arguing that an informal custom existed that amounted to a widespread practice. [Doc. # 192, at p. 2; Doc. #183, at p.28.]  Plaintiff's other theory is that Denver Health failed to adequately train and supervise its employees to detect and treat spinal injuries. [Doc. # 192, at p. 2.]   Both theories fail because Plaintiff cannot show that a widespread practice exists, or the requisite deliberate indifference to demonstrate a failure to train, from the treatment related to her case alone.

### a. No Informal Custom Caused a Deprivation of Plaintiff's Constitutional Rights.

An informal policy, practice, or custom claim "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown,* 520 U.S. at 404 (citations omitted). For a municipality to be liable for an informal policy or custom, however, "a plaintiff [must] show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider*, 717 F.3d at 769. For policies that are lawful on their face, determining the municipality's culpability requires "more difficult problems of proof" and requires the application of rigorous standards of culpability to ensure that the municipality is not held liable solely for the actions of its employees. *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

16

Here, Plaintiff has no evidence of an official policy that was so widespread as to have the force of law, much less to have caused the alleged deprivation of her rights. In fact, even Plaintiff's retained correctional medical care expert, Dr. Tubbs, expressly limited his opinions to the medical care received by Plaintiff. [**Exhibit E**, at 197:22-25.] Significantly, Dr. Tubbs admits that he is not critical of any policies or procedure of Denver or Denver Health. [*Id.*, at 195:15 - 196:5.] Plaintiff likewise has no evidence that a custom or policy had a direct causal link to her alleged constitutional injury. Furthermore, assuming *arguendo* that Plaintiff identified a custom or policy that played a role in her medical care, no evidence exists that Denver acted with the culpability required to hold it liable for any alleged informal custom. To demonstrate deliberate indifference, Plaintiff must show that Denver had actual or constructive notice that its custom was "substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm." *Barney*, 143 F.3d at 1307.  Plaintiff cannot identify any prior incident that put Denver on the notice required for deliberate indifference. Consequently, Plaintiff cannot meet her burden of presenting sufficient evidence on her policy or custom claim against Denver.

### b. Denver Health's Training Was Adequate and No Evidence of Deliberate Indifference Exists.

Similarly, Plaintiff identifies no deficiency with training and lacks evidence of prior incidents that put Denver on notice of an alleged deficiency in training. Consequently, judgment must be entered for Denver on Plaintiff's failure-to-train theory.

It is only when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003). *See also City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)

(A claim for failure to train must be based on specific allegations of a particular deficiency in the municipality's training program). Plaintiff must demonstrate that Denver knew or should have known that a constitutional violation was "substantially certain to result." *See Barney*, 143 F.3d at 1307. Here, Plaintiff appears to claim[3] that inaction resulting from Denver Health's failure to properly train its employees resulted in a deprivation of her constitutional right to adequate medical care. In order to succeed on such a claim, Plaintiff must meet a demanding standard:

> If the plaintiff asserts the alleged custom or policy comprised a failure to act, he or she must demonstrate the municipality's inaction resulted from "deliberate indifference to the rights" of the plaintiff. More specifically, if the inaction theory rests on an alleged failure to train, the plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for additional training. Ordinarily, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose [municipal] liability." In the case where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued.

*Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir.1996); *see also Harris,* 489 U.S. at 388 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality … can a city be liable for such a failure under § 1983").

Accordingly, claims of municipal liability based on a failure to train must ordinarily be based on a pattern of unconstitutional behavior of which the municipality has notice, and the plaintiff must allege sufficient facts suggesting that the municipality showed deliberate indifference by choosing to disregard the risk of harm. *Barney,* 143 F.3d at 1307–08. In a narrow

---

[3]Plaintiff was unable to identify any specific policy, practice, or custom of Denver Health that any Denver Health employee was acting pursuant to in their actions related to Plaintiff. [**Exhibit Z**, Plaintiff's Discovery Responses, dated 5/5/2017, at pp. 2-3.].

class of cases, deliberate indifference may be shown based on a discrete act if a "violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations...." *Id.* at 1308. Therefore, the issue in this case is whether the alleged failure to provide medical care to the Plaintiff alone created a "plainly obvious" risk that Plaintiff's constitutional rights would be violated due to inadequate training of hospital staff. No such evidence exists.

All Denver Health medical staff are required to have the appropriate licensing and certification as required under state and federal law, and the nurses in the correctional care facilities are qualified to provide patient care by going through nursing school and taking a national exam. *See* SUMF, ¶¶ 7& 9. Every medical provider within the Denver Health Denver Sheriff Health Services Division must demonstrate competencies on skills related to providing medical care and must maintain 40 hours of yearly continuing education. *See* SUMF, ¶ 10. Newly-hired Denver Health nursing staff go through orientation and a minimum of 12 shifts of on-the-job training with another nurse. *See* SUMF, ¶ 6. In addition to training and credential requirements, Denver Health maintains protocols for different complaints that a patient may have to provide information and guidance to nurses. See SUMF, ¶ 7. Nursing staff are told where to access the protocols, policies, and procedures, and the protocols are updated regularly with the updates distributed to all medical staff. *See* SUMF, ¶ 6-7. Further, all Denver Health medical staff receive annual skills and training related to their positions. *See* SUMF, ¶ 9. DSD deputies are trained to recognize certain medical conditions and to relate this information to the medical staff. *See* SUMF, ¶ 11. This health-related training for deputies includes first aid and basic CPR, and also recognition of the need for

emergency care in life-threatening situations and recognition of the acute manifestations of chronic illnesses, intoxication and withdrawal, and adverse reactions to medications. [*Id.*] Considering the extent of training and resources provided, Plaintiff cannot identify evidence in the record that any constitutionally deficient training of Denver Health caused her claimed injury.

Moreover, Plaintiff cannot identify any need for more or different training that was so likely to result in the violation of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent. *See Carr* 337 F.3d at 1229. Therefore, Plaintiff has failed to demonstrate that a Denver Health policy, practice, or custom, or failure to train, caused any constitutional violation.

## V.      CONCLUSION

For the reasons stated herein, Denver respectfully requests that the Court grant their Motion and enter judgment in favor of Denver, dismissing all claims against Denver with prejudice, under Fed. R. Civ. P. 56 along with such other and further relief as the Court deems appropriate.

DATED this 26th day of June, 2017.

Respectfully submitted,

*s/Conor D. Farley*
Conor D. Farley, Assistant City Attorney
Cristina Peña Helm, Assistant City Attorney
Denver City Attorney's Office, Litigation Section
201 W. Colfax Avenue, Dept. 1108
Denver, CO 80202-5332
Telephone: (720) 913-3100
Facsimile:  (720) 913-3182
E-mail:  conor.farley@denvergov.org
          cristina.helm@denvergov.org
*Attorneys for Defendant City & County of Denver*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 26th day of June, 2017, the foregoing **DEFENDANT CITY AND COUNTY OF DENVER'S MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court via the CM/ECF system, which will send notification of such filing to the following:

Kathleen K. Custer, Esq.
Jessica J. Smith, Esq.
J. Lee Gray, Esq.
Kristina R. Van Bockern, Esq.
kkcuster@hollandhart.com
jjsmith@hollandhart.com
lgray@hollandhart.com
trvanbockern@hollandhart.com
*Attorneys for Plaintiff Rebecca Trujillo*

Patrick A. Singer, Esq.
psinger@kresljohnson.com
*Attorney for Defendants Anthony Perez, RN;*
*Victoria Toliver, RN; and Dana Wimberly, RN*

*s/Conor D. Farley*
Denver City Attorney's Office