```
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
 2                    *   *   *

 3

 4   REBECCA TRUJILLO        )
                             )  Deposition of:
 5                           )
          Plaintiff,         )    KENNON TUBBS, M.D.
 6                           )
     vs.                     )
 7                           )
     CITY AND COUNTY OF      )  Civil No.
 8   DENVER, COLORADO;       )  14-cv-2798-RBJ-MEH
     ANTHONY PEREZ, RN;      )
 9   VICTORIA TOLIVER, RN;   )
     DANA WIMBERLY, RN;      )
10   all medical providers   )
     in the Denver City      )
11   Jail Infirmary,         )
                             )
12        Defendants.        )

13

14        BE IT REMEMBERED that on Friday;
     April 14, 2017, that the deposition of
15   KENNON TUBBS, M.D., produced as a witness
     herein at the instance of the defendants
16   Anthony Perez, RN; Victoria Toliver, RN;
     Dana Wimberly, RN, herein, in the
17   above-entitled action now pending in the
     above-named court, was taken before DEBRA A.
18   DIBBLE, a Registered Diplomate Reporter and
     Certified Realtime Reporter, commencing at
19   the hour of 9:00 a.m. of said day, at the
     offices of Tempest Reporting, 175 S. Main
20   Street, Suite 710, Salt Lake City, Utah.

21

22                   *   *   *

23     H+G

24
       Hunter+Geist, Inc.
25
```

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**EXHIBIT E**

**KENNON TUBBS, M.D. - 4/14/2017**
**Rebecca Trujillo v. City and County of Denver, Colorado, et al.**

---

165

plan J-A-O7, that I'm referring to.
    Q. In your experience, do jails either adopt the NCCHC policies and procedures, or not? Or alternatively, can the policies and procedures be amended based on the NCCHC standards?
    MS. SMITH: Object to the form.
    Q. (BY MR. SINGER) Do you understand my question?
    A. My personal experience is that I deal with multiple different jails. And some jails are not able to adopt NCCHC standards because they are smaller jails, or they don't have the staff to be able to provide that level of care.
    For instance, one of my jails does not have a nurse because it only has 30 people in the entire jail. And they don't have a nurse on staff, and they only have four officers.
    So they are not able to meet the NCCHC standards, based on their staffing.
    Q. Right.
    A. So my -- jails decide, as an administration, whether they want to be NCCHC

166

certified. And it's my understanding, by Dr. Alvarez's report, that Denver jail has been NCCHC certified since 1982, and they were recertified in 2011 and 2014.
    So it's my understanding that Denver jail has agreed to follow the standards of NCCHC policy.
    Q. So, all right. So my question is, if one is accredited by the NCCHC, if a jail is, in your experience, do they have to adopt all of these policies and procedures in the book that you described?
    Or can they adopt some and not others?
    MS. SMITH: Object to the form.
    Q. (BY MR. SINGER) If you know.
    A. I am an NCCHC certified physician, but I am not -- Dr. Alvarez is an NCCHC employee. So he would be better to answer that question than I would.
    Q. And then a similar question. If an institution, a jail, is NCCHC accredited, to your knowledge, based on your experience, are they allowed to adopt an NCCHC policy, but then amend it in certain

167

ways and still stay accredited? Still, you know, pass in terms of their survey? If you know.
    A. I am not an NCCHC certifier -- or surveyor, but I do know that we have modified policies and procedures, and we submit those to NCCHC for review. And if they're approved, then we maintain our NCCHC accreditation.
    If they're not approved, then we need to make the changes.
    If we want the NCCHC accreditation, then we have to make the changes in the policies and procedures so they approve of them.
    MS. SMITH: And I want to make a record that we have requested these policies. And so to the extent there are different ones, we would just like them.
    Q. (BY MR. SINGER) Do you work for a facility that is NCCHC accredited?
    A. I do.
    Q. Who is that?
    A. Utah County jail.

168

    Q. Do you consider the NCCHC accreditation to be a good one? Or not?
    MS. SMITH: Object to the form.
    THE WITNESS: Define "a good one".
    Q. (BY MR. SINGER) Okay. If a --
    A. A good idea?
    Q. If a jail is NCCHC accredited, is that considered, in your opinion, a high level of accreditation? Or a low level of accreditation? Or something else?
    MS. SMITH: Object to the form.
    THE WITNESS: I think that all of the NCCHC standards are appropriate for healthcare, and that jails should strive to meet that standard when possible.
    And that I'm not saying that NCCHC accreditation is mandatory to provide quality healthcare in a jail setting. Many jails provide quality healthcare without being accredited by NCCHC. But if you choose to be NCCHC certified, you need to follow their

42 (Pages 165 to 168)

**169**

1  recommendations and their policies and
2  procedures.
3       MR. SINGER: Okay.
4       THE WITNESS: Or you won't get
5  accreditation.
6       Case in point, the Utah County
7  jail, when they did their survey, had
8  six points that had to be amended in
9  order to receive accreditation. And
10 so we had to make those changes
11 to -- we -- you know, in order to get
12 accredited.
13      Q.   (BY MR. SINGER) I wanted to
14 just direct your attention, then, to page 13
15 and 14 of your rebuttal report.
16      In here, you state that you
17 reiterate your opinions.
18      A.   Page 13?
19      Q.   Yeah. At the very bottom.
20      And then, if you flip over to
21 14, you have --
22      A.   I reiterate my opinion?
23      Q.   Yeah.
24      A.   That Denver County jail did not
25 meet NCCHC standard for access to care?

**170**

1       Q.   Correct.
2       And then, two, did not meet
3  NCCHC --
4       Well, and first of all, let me
5  ask you this. When you say Denver County
6  jail, what do you mean?
7       A.   I mean the jail that
8  Ms. Trujillo was incarcerated at in the
9  records that I reviewed.
10      Was she not at the Denver
11 County jail?
12      Q.   Well, so they become specific
13 names.
14      You had testified earlier it
15 was your understanding there were two
16 different locations, and then we've also
17 talked about this referral to the
18 correctional care medical facility at the
19 Denver Health Medical Center.
20      And so, I mean, I have to ask
21 you the question, because it's your report.
22      What do you mean, when you say
23 "Denver County jail did not meet the NCCHC
24 standard", and then you list one of these?
25      A.   So --

**171**

1       Q.   Who are you talking about?
2       A.   I would -- I am
3  encompassing -- when I say Denver County
4  jail, I'm encompassing the care that was
5  provided by the county for Ms. Trujillo,
6  whether it be at jail No. 1, or jail No. 2,
7  or the correctional facility medical facility
8  that the jail contracts with to have them
9  evaluate their patient there.
10      So I would use the word Denver
11 County jail as an umbrella for all of the
12 care that was provided to Ms. Trujillo.
13      Q.   Okay.
14      A.   And not a specific entity
15 of -- other than that umbrella of care.
16      Q.   Okay.
17      A.   Maybe I should have said the
18 sheriff's department, or, you know, whoever
19 is -- the county council, whoever is in
20 charge of that medical contract.
21      Q.   Okay.
22      A.   Whoever is in charge of
23 providing medical care, and meeting the
24 constitutional requirement for healthcare in
25 an incarcerated setting.

**172**

1       Q.   Okay.
2       And you state that Denver
3  County jail did not meet J-A-01, J-C-08,
4  J-E-04, J-E-07, J-E-11, J-E-12, J-E-13,
5  J-D-05, J-A-07.
6       Do you -- have you seen these
7  policy documents as utilized by, in your
8  words, the Denver County jail?
9       A.   No. I requested them. My
10 attorney obtained those for me, but I have
11 not seen any documents.
12      I merely am stating that the
13 care that Ms. Trujillo received did not meet
14 NCCHC standards for these articles.
15      MS. SMITH: Again, I think
16 those are subject to an outstanding
17 discovery request, just for the
18 record.
19      Q.   (BY MR. SINGER) And so you're
20 applying the form articles from the NCCHC
21 book that you have; correct?
22      A.   Correct. I think I did list,
23 in my report, exactly how she did not
24 meet -- or the Denver jail did not meet these
25 standards. I stated the standards, and how I

Case 1:14-cv-02798-RBJ-MEH   Document 212-5   Filed 06/26/17   USDC Colorado   Page 4 of 7

KENNON TUBBS, M.D. - 4/14/2017
Rebecca Trujillo v. City and County of Denver, Colorado, et al.

173

1  believed that these standards were not met.
2      For instance, if you refer to,
3  you know, all of these pages. Page 11, for
4  instance? It talks about continuity of care
5  for incarceration, and it gives the standard.
6      The standard is inmates receive
7  treatment and diagnostic tests ordered by
8  clinicians. And she did not receive the
9  treatment or the diagnostic tests that were
10 ordered by the physicians. The clinicians
11 ordered a neurosurgery consult, and she did
12 not receive that.
13     **Q.   And that doesn't comply with**
14 **the NCCHC article that is applicable?**
15     A.   Right. The continuity of care
16 indicates that inmates -- the -- it states,
17 "inmates receive treatment and diagnostic
18 tests ordered by clinicians", and then it
19 gives the compliance indicators.
20     In order to be compliant with
21 that standard, it gives the standards that
22 they did not.
23     **Q.   You're not saying that the**
24 **NCCHC standards and articles are**
25 **inappropriate?**

174

1      A.   No. NCCHC standards are ideal.
2  I mean, we should all strive to
3  practice within their standards.
4      **Q.   Do you think that --**
5      A.   And Denver jail did not do
6  that.
7      **Q.   Do you think that, when Denver**
8  **County jail did not meet these standards, or**
9  **when Denver County jail does not meet one of**
10 **these standards, that that is, by definition,**
11 **substandard? Below the standard of care**
12 **care?**
13     **In other words, you had said,**
14 **"This is what we should all strive to meet.**
15 **These are ideal."**
16     **And so my question is, in your**
17 **opinion, is it possible to not quite meet one**
18 **of the standards, in some way, for some**
19 **particular course of care, but still, in your**
20 **opinion, provide care that is within the**
21 **standard of care?**
22     MS. SMITH: Object to the form.
23     THE WITNESS: I agree that you
24 can provide excellent care without
25 meeting the standards of NCCHC.

175

1      You can provide exceptional
2  care and not meet the standards of
3  NCCHC.
4      In this case, Ms. Trujillo's
5  case, they did not provide care at
6  all, whether it be by AAFP standards,
7  American Academy of Family Physician
8  standards, whether it be my NCCHC
9  standards, they did not meet any type
10 of standard of care.
11     **Q.   (BY MR. SINGER) Because of**
12 **this ten-month delay in getting to the**
13 **surgery that we now know she needed to**
14 **decompress her cervical spine --**
15     MS. SMITH: Object to the form
16 and foundation.
17     **Q.   (BY MR. SINGER) -- right?**
18     MS. SMITH: And misstates prior
19 testimony.
20     THE WITNESS: They failed to
21 recognize her acute and neurologic
22 need. They failed to send her to the
23 emergency room. They failed to
24 provide an MRI in an appropriate
25 timeframe.

176

1      They housed her in a bed and
2  put her on bed rest, with no physical
3  therapy, no type of chronic --
4  continuing evaluation, and no
5  physician access for months.
6      When they did get an MRI,
7  finally, 97 days after her incident,
8  they didn't follow up on the MRI for
9  another three months. No one reported
10 the MRI results to Ms. Trujillo. No
11 one reported the MRI results in the
12 chart. No one addressed the MRI
13 findings.
14     You know, they just dropped it.
15     **Q.   (BY MR. SINGER) How can you**
16 **say "no physician access"?**
17     A.   The medical charting, if a
18 patient is in the infirmary, the physicians
19 should be rounding on that patient on a
20 regular basis.
21     There was not significant
22 patient --
23     I was told was in the
24 infirmary, but was not being rounded on by a
25 physician on a regular basis.

Case 1:14-cv-02798-RBJ-MEH  Document 212-5  Filed 06/26/17  USDC Colorado  Page 5 of 7

KENNON TUBBS, M.D. - 4/14/2017
Rebecca Trujillo v. City and County of Denver, Colorado, et al.

189

know.
    MR. SINGER:  Why would there be discrepancies, then, if you only prepared one draft?
    MS. SMITH:  He's just being nice.
    THE WITNESS:  Because I have not read both Exhibit 7 and Exhibit 6 word for word.
    Q.   (BY MR. SINGER)  Okay.  So it looks like there -- the last pages are the same, but we get, in what's been marked 7, we get three lines at the bottom, after the same NCCHC articles are referred to.  And it says, "In conclusion, the staff was undertrained and deliberately indifferent to Trujillo's medical needs.  This caused deliberate delays, inadequate nursing assessment, untimely follow-up, poor continuity of care, and poor communication between the nursing staff and the providers of --", and then it picks up where it -- where it left off.
    What are your opinions about undertraining with regard to the staff, and who do they apply to?

190

    A.   My opinion is that I would assume that the nurses were adequately trained, and could apply their nursing skills to each and every patient.
    But in this case, their nursing skills were not applied to Mrs. Trujillo, and she was not adequately assessed, not adequately triaged, and subsequently did not receive the definitive treatment that she needed.
    Q.   Why does that mean that the staff was undertrained?  If it does?
    A.   That's an opinion as to maybe what happened.  That they were undertrained.  Because I would assume that if they were appropriately trained, they would have appropriately sent her to the emergency room.
    Q.   But as we discussed earlier, if this happened at one of your jails, you would update -- you'd have a meeting, and you'd talk to the nurses about how we need to do things differently, and you'd provide that training.
    That doesn't necessarily mean that your nurses were undertrained, but they

191

could have been, and so that's why you provided that training.
    So isn't it possible here, that the nurses had sufficient training, but still, for some reason, the assessments didn't meet your requirements?
    MS. SMITH:  Object to the form and foundation.
    THE WITNESS:  They may have been appropriately trained, and if they were appropriately trained and they had the knowledge to appropriately deal with the situation and they chose not to, that's a problem.  That's a significant problem.
    Q.   (BY MR. SINGER)  Well, you say --
    A.   That's deliberate indifference.
    Q.   Well, you say "they chose not to".  But isn't it also possible that they just didn't do it for some other reason?  Like a mistake?
    MS. SMITH:  Object to the form and foundation.

192

    THE WITNESS:  It's -- it is --
    Q.   (BY MR. SINGER)  Do you understand my question?
    A.   Yes, I do.
    It is certainly considerable that they made a mistake.  I agree.
    MR. SINGER:  All right.  I have no further questions at this time.
    MS. SMITH:  I have some questions, Conor.  Do you have questions?
    MR. FARLEY:  I do have questions.
    MS. SMITH:  Do you want to go first?
    CROSS EXAMINATION
BY MR. FARLEY:
    Q.   Dr. Tubbs, again, my name is Conor Farley.  I'm appearing in this hearing on behalf of the City and County of Denver in this lawsuit.
    Earlier it sounded like you gave testimony that you were critical of the hiring decision, meaning you were critical of the decision of Denver to hire Denver Health

**KENNON TUBBS, M.D. - 4/14/2017**
**Rebecca Trujillo v. City and County of Denver, Colorado, et al.**

---

Page 193

1  and Hospital Authority to apply and
2  administer medical healthcare of inmates.  Is
3  that true?
4      A.   I don't recall being critical
5  of that decision.
6      Q.   Okay.  Are you not critical of
7  that decision?
8      A.   No, I'm not critical of that
9  decision.
10     Q.   Okay.
11     A.   I have not --
12          There's no evidence --
13          MS. SMITH:  Conor, he was still
14 talking.
15          THE WITNESS:  I have not
16 reviewed any documents as to why that
17 decision was made, or how that
18 decision was made, or the contract.
19          I don't have an opinion as to
20 the -- how that decision was made, and
21 how that relationship works.
22     Q.   (BY MR. FARLEY)  Okay.  So
23 you're not going to be giving any opinion in
24 this lawsuit as to the decision of the City
25 and County of Denver to hire Denver Health

---

Page 194

1  and Hospital Authority to provide and
2  administer healthcare to inmates, are you?
3      A.   No.  That would be -- I'm not
4  an expert in that.
5      Q.   Okay.  Fair to say that it's
6  reasonable for Denver to contract with an
7  NCCHC-certified medical provider?
8      A.   I agree.
9      Q.   You did testify that you were
10 critical of the Denver jail administration
11 for their policies and procedures regarding
12 spinal care?
13          Do you recall that?
14     A.   I do recall that.
15     Q.   What policies are you critical
16 of?
17     A.   That a patient who has an acute
18 spinal injury is not referred to the
19 emergency room emergently.
20     Q.   So it's not the policy that
21 you're critical of, it's the application of
22 the policy to Ms. Trujillo?
23     A.   Yeah.
24     Q.   It's not following a policy?
25     A.   That's correct.

---

Page 195

1          I have not --
2          MR. FARLEY:  Okay.  See --
3          MS. SMITH:  Conor, he's still
4  talking.
5          THE WITNESS:  I have not been
6  able to --
7          Sorry.
8          MS. SMITH:  No, you can go
9  ahead.
10         THE WITNESS:  I have not been
11 able to review any policies from
12 Denver County jail.  Those have not
13 been provided for me, nor did I review
14 any policies.
15     Q.   (BY MR. FARLEY)  So you have
16 not issued any opinions regarding the
17 policies and procedures of Denver jail;
18 correct?
19     A.   That's correct.  I have not
20 reviewed the policies and procedures of
21 Denver jail, nor have I issued any opinions
22 of that.  I have simply issued opinions about
23 the care for Ms. Trujillo.
24     Q.   And that's true for Denver
25 Health and Hospital Authority as well?

---

Page 196

1          You have not issued any
2  opinions regarding any policies or procedures
3  regarding Denver Health and Hospital
4  Authority?
5      A.   Correct.
6      Q.   You were -- you had testified
7  earlier that Ms. Trujillo did not have access
8  to medical care, or, specifically, did not
9  have access to timely neurosurgery; correct?
10         MS. SMITH:  Object to the form.
11         THE WITNESS:  Correct.
12         MR. FARLEY:  Okay.
13     Q.   (BY MR. FARLEY)  And are you
14 critical of the Denver jail for that?  Or
15 are you critical for -- of Denver Health and
16 Hospital Authority as the medical provider?
17         MS. SMITH:  Object to the form.
18         THE WITNESS:  I think that the
19 Denver jail is responsible for
20 overseeing any contract that they put
21 into place to provide medical care
22 inside their jail.
23         And they cannot turn a blind
24 eye to the type of care that's being
25 provided by a contractor that they

---

**EXHIBIT E**

KENNON TUBBS, M.D. - 4/14/2017
Rebecca Trujillo v. City and County of Denver, Colorado, et al.

---

Page 197

1  hired to do it, much to the same
2  notion that, if I hire a contractor to
3  do my basement and he does it wrong
4  and I am not overseeing that,
5  that's -- I'm still responsible for
6  that.
7      And I believe the Denver jail
8  is responsible for overseeing the
9  medical providers that they provide,
10 to make sure that they are providing
11 the type of care and quality assurance
12 that they expect on their contract.
13     Q.  And do you have any -- any
14 evidence or have you seen anything that would
15 lead you to conclude that Denver had notice
16 or any reason to believe that Denver Health
17 and Hospital Authority was not providing
18 access to neurosurgery or other spinal care?
19     MS. SMITH:  Object to the form.
20     THE WITNESS:  I don't have any
21 evidence to support that, no.
22     Q.  (BY MR. FARLEY)  So your
23 opinion is simply based on Ms. Trujillo's
24 care?
25     A.  Correct.

Page 198

1      Q.  After the fact?
2      A.  Right.
3      The care that she did not
4  receive?
5      Q.  Yeah.
6      A.  In a timely manner.
7      Q.  On page 13 of Exhibit 1, in
8  the --
9      A.  This is Exhibit 2.
10     MS. SMITH:  Hold on.  We're
11 still trying to find Exhibit 1.
12     THE WITNESS:  I have Exhibit 2.
13 7, 3.
14     That was the Mondragon --
15 I believe it's this right here.
16     MS. SMITH:  It should have a
17 stamp.
18     MR. SINGER:  What is that
19 document, Conor?
20     MR. FARLEY:  It's the original
21 report.  I'm sorry.
22     MS. SMITH:  I don't know where
23 that is.
24     THE WITNESS:  Wasn't Exhibit 1
25 the Mondragon letter?

Page 199

1      MR. SINGER:  Yeah.  Is it
2  Exhibit 2?
3      MR. FARLEY:  I'm referring to
4  the report.
5      I'll defer to you.  I may have
6  mixed up the exhibits here.
7      THE WITNESS:  Exhibit 1 was the
8  Mondragon --
9      MS. SMITH:  It's the May 10th.
10     MR. SINGER:  Rheumatology
11 consult.
12     THE WITNESS:  Rheumatology
13 consult.
14     MR. FARLEY:  Just look at page
15 one of your original report.
16     THE WITNESS:  I've got it.
17     MR. FARLEY:  Page 13 of your
18 original report.
19     THE WITNESS:  Page 13?
20     Q.  (BY MR. FARLEY)  And in the --
21 Page 13.
22     On the fifth line down, your
23 report states, "The jail decided to wait
24 29 days to schedule the MRI"?
25     Do you see where I am?

Page 200

1      A.  I see that, yes.
2      Q.  What do you mean by "the jail"?
3      A.  Well, it's -- in my jails, when
4  a physician orders a procedure to be done,
5  then it has to be approved by the jail and
6  then scheduled by the jail.
7      And the reason it -- in my
8  institutions, the reason it has to be
9  scheduled by the jail and not the physician
10 is because the jail has to provide custody,
11 officers, to escort and take the person to
12 and from the appointments.
13     So the jail needs to schedule
14 that around their ability to provide that
15 type of access for the inmate to go to and
16 from the facilities, and that's why I
17 would --
18     Q.  And so --
19     A.  -- make that comment, that they
20 waited 29 days, because the MRI was ordered
21 ASAP.  On the chart it actually says MRI
22 ASAP.
23     And whoever scheduled that
24 appointment, whoever was responsible at the
25 Denver jail for scheduling that appointment,

---

50 (Pages 197 to 200)

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT E**