IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-2798

REBECCA TRUJILLO,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, *et al*.,

     Defendants.

---

## PLAINTIFF REBECCA TRUJILLO'S RESPONSE IN OPPOSITION TO NURSE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Rebecca Trujillo, by and through undersigned counsel, hereby responds in opposition to the Motion for Summary Judgment (Dkt. No. 211, the "Motion") filed by the three Nurse Defendants, Anthony Perez, RN, Victoria Toliver, RN, and Dana Wimberly, RN, (collectively "Nurse Defendants").

# INTRODUCTION

On July 4, 2012, while incarcerated at the Denver County Jail, Ms. Trujillo suffered spinal injuries while using a large floor-buffer machine. She immediately had symptoms of a serious neurological injury, including repeated falls, altered gait, slowed speech, reduced ability to use her hands and legs, loss of control over her bowel movements, and severe pain. Over the next ten months, the Nurse Defendants refused or delayed in performing their medical "gatekeeper" functions by denying Ms. Trujillo access to necessary medical care for her significant medical needs. The Nurse Defendants were deliberately indifferent to Ms. Trujillo's ongoing serious medical needs and denied her timely access to care *despite* knowledge that

specialists had identified a serious neurologic illness warranting "urgent" follow-up. Moreover, the Nurse Defendants independently failed to detect and obtain treatment for Ms. Trujillo and, instead, only provided cursory medical attention while Ms. Trujillo was housed in the infirmary due to her neurological symptoms. The Nurse Defendants' constitutional violations continued until Ms. Trujillo was released from jail, after which Ms. Trujillo immediately received the long-awaited spinal surgery at Denver Health Medical Center.

The Nurse Defendants seek summary judgment, but there are genuine issues of material fact related to the Nurse Defendants' medical care that must be decided by a finder of fact at trial. Additionally, the Nurse Defendants are not entitled to summary judgment on their claim of qualified immunity. The Court should therefore deny the Motion.

### **RESPONSE TO NURSE DEFENDANTS' STATEMENT OF MATERIAL FACTS[1]**

1–8.    Ms. Trujillo admits the quoted portions of medical records found in paragraphs 1-8, but denies she was accurately diagnosed with rheumatoid arthritis ("RA"). While several of these records (Nurse Exhibits B-D) demonstrate that healthcare providers, including nurses and physicians in the Denver Jail, repeatedly treated Ms. Trujillo for RA based on her subjective complaints (and later positive blood test for rheumatoid factor), Ms. Trujillo was never diagnosed with RA. In fact, a rheumatologist later affirmatively confirmed that Ms. Trujillo did not have RA in August 2012. *See* Nurse Ex. T (finding in her history that, although she believes that she has RA, "[s]he has no symptoms of rheumatoid arthritis" and in his assessment, "[c]ertainly, I do not find any evidence of rheumatoid arthritis.").

---

[1]  All references to lettered "Nurse Exhibits" refer to the Nurse Defendants' designated exhibits:  Dkt. Nos. 211–1 through 211–36. For ease of reference and the Court's convenience all exhibits for this Response Brief and Ms. Trujillo's Response to the City's Motion for Summary Judgment are collectively contained in the Appendix of Exhibits filed herewith.

9.      Ms. Trujillo admits the quoted language from Nurse Ex. G in paragraph 9 is both accurate and refers to her (instead of the incorrectly identified patient "Rebecca Mondragon"), but denies that this record indicates a diagnoses of RA or suggests that her subsequent neurological injuries were pre-existing conditions. In fact, this note, from the same rheumatologist who saw her after her injury, indicates "full range of motion of the shoulders and elbows" and does not indicate any findings or complaints of weakness, numbness, tingling or trouble ambulating. Compare Nurse Ex. G to Nurse Ex. T. Moreover, the May 10, 2012 note confirms that Ms. Trujillo was having "an okay time functioning," and only a "hard time doing *very physical labor*." Nurse Ex. G (emphasis added). In addition, although this clinic note relates to Ms. Trujillo, and was produced by Defendants in this case, it was not present in her medical record at the Denver Jail (according to the July 12, 2017 note marked as Nurse Ex. K).

10.     Ms. Trujillo admits that Nurse Ex. H is her July 4, 2012 medical kite complaining of "severe numbness" in her hands, knees and feet, difficulty walking, multiple falls, severe pain, and loss of grip. *See* Nurse Ex. H. And contrary to the Nurse Defendants' suggestion otherwise, with the lone exception of pain, none of Ms. Trujillo's medical records prior to July 4, 2012, include these significant neurological symptoms. The July 6, 2012 progress note also demonstrates that the examining nurse did not obtain a comprehensive history of this sudden onset of neurological complaints or notify an on-call doctor to provide urgent care. Nurse Ex. H; *see also* Declaration of Jane Grametbauer, ¶¶ 23-24, 28, marked as **Exhibit 1**.

11–12. Admitted. Moreover, Nurse Exs. I and J indicate that—despite complaining of multiple neurological symptoms, such as multiple falls (once striking her chin), and unsteady gait with use of a walker—the examining nurses continued to ignore significant neurological

symptoms and still did not notify an attending physician to obtain urgent treatment.

13.     Plaintiff admits the quoted portions of the July 12, 2012 progress note (Nurse

Ex. K), including that she was a fall risk and that her May 10, 2012 Clinic Note with Dr. Dennis

Boyle was missing from her medical record. This progress note also clears Ms. Trujillo for

transfer back to the general population despite the fact that it also notes that she is a fall risk and

using a walker and despite the earlier July 11, 2012 progress note that documents Ms. Trujillo's

"much difficulty" with activities of daily living—including having feces on herself and inability

to clean herself—risk of falling, instability with a walker, and the Denver Sheriff Department's

("DSD") expressed need to house Ms. Trujillo in the infirmary at the Denver Detention Center

("DDC"). *See* Nurse Ex. L. Moreover, the July 12, 2012 progress note does not indicate any

attempted follow up to obtain the May 10, 2012 rheumatology clinic note.

14.     Admitted. This progress note also shows DSD personnel's knowledge concerning

Ms. Trujillo's fall risk, problems performing daily living activities, and concern over housing

Ms. Trujillo in the general population instead of the infirmary at the DDC. *See* Nurse Ex. L.

15.     Admitted. In addition to the facts identified by the Nurse Defendants, this record

also documents Ms. Trujillo's continued chronic pain, tingling, and paresthesias, as well as lab

finding of normal rheumatoid factor. *See* Nurse Ex. M; Declaration of Dr. Kennon Tubbs, ¶ 4,

marked as **Exhibit 2**.

16–17. Admitted. In addition to reporting that Plaintiff felt like she was having a stroke,

Nurse Exs. N and O document multiple falls reported by DSD personnel, a 3cm bruise on her

arm, use of a wheelchair for ambulation (Nurse Ex. O), as well as demonstrate a nurse's

objective findings of tingling in the extremities and unsteady gait (Nurse Ex. N). The July 25

4

progress note also shows that, despite Ms. Trujillo's report that she felt like she was having a stroke and the above neurological symptoms, the treating nurse did not call a physician and instead assessed her as "stable," with a plan of care to "continue to monitor." Nurse Ex. N.

18.    Admitted. In addition, this progress note indicates that Ms. Trujillo was experiencing increased weakness, trouble with her activities of daily living since July 6, 2012, worsening gait and mobility, and neurologic exam was non-focal. *See* Nurse Ex. P.

19.    Admitted. In addition, as noted in Nurse Exhibit Q, it was the DSD "staff" (Sargent Gutierrez), not any of the health care providers at the jail, requested Ms. Trujillo be moved to the infirmary in the DDC.

20.    Ms. Trujillo admits that she was repeatedly having difficulty transferring from her wheelchair to the toilet or bed and fell to the floor, as described in Nurse Ex. R.

21.    Plaintiff admits that Dr. Crum evaluated her on August 1, 2012 and questioned whether she was malingering, while noting her use of walker and wheelchair, complaints of numbness, "stroke," and "slips." *See* Nurse Ex. S. Plaintiff also admits that Dr. Crum's only plan was to refer Ms. Trujillo for the next available evaluation by Dr. Stob, which occurred on August 13, 2012, according to Nurse Ex. U. This malingering notation likely tainted nurses' subjective view of Plaintiff, adversely affecting their treatment of her. *See* **Exhibit 1** at ¶ 25.

22.    Plaintiff admits that Dr. Boyle found no symptoms of rheumatoid arthritis in his August 10, 2012 clinic note (Nurse Ex. T). Moreover, Dr. Boyle also notes numerous neurological complaints, including "seven weeks of symptoms," weakness, numbness, tingling, and inability to walk without a walker. Nurse Ex T at 1. He confirms these symptoms in his physical examination (including "obvious left side hemiparesis with a left claw hand and very

weak left side, about 2/4 in terms of strength … very poor fine motor function", and 3/5 strength

on her right side. *Id*. Dr. Boyle's assessment was that Ms. Trujillo "would appear to have **a very**

***significant neurologic illness***" that he thought could be "either a stroke or diffuse neurologic

illness." *Id*. (emphasis added).

In addition to finding no symptoms of RA, Dr. Boyle affirmatively noted, "[c]ertainly, I

do not find any evidence of rheumatoid arthritis." *Id*. Dr. Boyle instead concluded that Ms.

Trujillo needed "***an urgent neurologic evaluation for this with CT scan, MRI, and a***

***neurologic consult***" and again stated that he "would indeed suggest a ***rather urgent neurologic***

***consult***." *Id*. at 2 (emphasis added). Dr. Boyle specifically ordered an "urgent neurology eval,"

which was noted and placed on the appointment board by Nurse Defendant Toliver. *See* August

10, 2012 Consultation and Referral Record, copy attached as **Exhibit 3**; Depo. of Victoria

Toliver, 65:15-67:19, 70:15-71:4, 72:13-76:4, attached as **Exhibit 4**.

23.     Admitted. In addition, this note indicated that Plaintiff's chart was not available

for Dr. Stob to review when conferring with Dr. Boyle. *See* Nurse Ex. U.

24.     Plaintiff admits the limited facts stated in paragraph 24, including the fact that the

neurological consult did not occur for nearly a month after Dr. Stob ordered it on August 13,

2012, and admits to the additional facts found in the September 12, 2012 clinic note, including

Ms. Trujillo's description of her incident with the floor buffer, as well as findings of unsteady

gait, requiring a walker and wheelchair, weakness in lower extremities, numbness, and falls. *See*

Nurse Ex. V. In addition, Dr. Hughes ordered the MRI of brain, thoracic, and cervical spine to

rule out new ischemia, and follow up after imaging. *Id*. Nurse Wimberly noted the order for an

"MRI ASAP" in the September 12, 2012 Hospital Return Assessment. Return Assess., marked as

**Exhibit 5;** Depo. of Dana Wimberly, 107:23-108:6, 109:21-110:13, marked as **Exhibit 6**.

25.     Ms. Trujillo admits that the "ASAP" MRI ordered on September 12, 2012 was not performed until October 10, 2012. Plaintiff also admits the quoted portions accurately reflect what is stated in the October 10, 2012 radiology consultation report, marked as Nurse Ex. W. This MRI indicated, among other things, "advanced degenerative changes most pronounced at C4/5 greater than C5/6" and "associated *severe canal stenosis* at C4/C5 greater than C5/6 and associated myelomalacia of the cord." *See* Nurse Defendants' Expert witness report of Scott Anderson, MD, dated March 9, 2017, p. 2 (emphasis added), marked as **Exhibit 7**.[2]

26-28.  Plaintiff admits that she submitted medical kites identified as Nurse Exs. X and Y, and that the quoted language is correct. Ms. Trujillo does not recall whether she submitted any other medical kites from July 25, 2012 until January 13, 2013 and is unable to either admit or deny that factual allegation. Regardless, her medical records reflect that she was housed in the infirmary at the DDC from July 26, 2012 through her release in April 2013 where nurses periodically performed "chronic charting" of their observations. *See* Progress Notes (in chronological order), collectively marked hereto as **Exhibit 8**. Regardless of whether Ms. Trujillo submitted medical kites, her medical records reflect that after the MRI, Nurse Defendant Wimberly noted in her medical record that "No" follow-up appointment was needed. *See* October 10, 2012 Hospital Return Assessment, marked as **Exhibit 9.** Moreover, none of the healthcare providers in the DDC infirmary, including Defendant Nurse Perez who saw her thirteen times between August 26, 2012 and January 13, 2013, followed up or did anything at all regarding the October 10, 2012 MRI results or order for neurological follow up. **Exhibit 8.**

---

[2] Since Dr. Anderson has been designated as Defendants' expert witness, his report is an admission by a party opponent and not hearsay under F.R.E. 801(d)(2).

29.     Plaintiff admits that, after *three months* of inaction by the Nurse Defendants, she finally had to submit a medical kite, Nurse Ex. Z, on January 13, 2013 to request the follow up consult that Dr. Hughes ordered on August 10, 2012 to follow her October 10, 2012 MRI.

30-31.  Admit. Ms. Trujillo requested that this appointment with neurosurgery be made on March 21, 2013. *See* Medical kite, **Exhibit 10**. Ms. Trujillo's medical records from the Denver Jail confirm that the neurosurgical evaluation ordered by Dr. Maa on January 13, 2013, and requested again by Ms. Trujillo in March 21, 2013, was never scheduled or performed while she remained in custody of the Denver Jail through May 14, 2013.

32.     Ms. Trujillo admits that she was able to see a neurosurgeon, who recommended immediate surgery, after her release from the Denver Jail when she presented to an urgent care clinic, as well as the additional facts found in the May 16, 2012 consultation report marked as Nurse Ex. BB. Plaintiff denies the limited reason for surgery as stated by Defendant Nurses. The May 16, 2012 consultation report indicates that Dr. Vanderheiden reviewed her medical records, including October 10, 2012 MRI results, recommended surgery the following day for her "*spinal cord injury*, along with instability C4-C5, and her stenosis," and noted that her injury, "although chronic in nature since July 2012, *seems to be worsening* …" Nurse Ex. BB (emphasis added).

33.     Plaintiff admits that she underwent the long-overdue spinal surgery on May 22, 2013, but denies the Nurse Defendants' characterization of that surgery, for which they cite no evidence. Although Dr. Vanderheiden, who conducted Plaintiff's surgery, indicated in deposition that he believed it was successful, he also testified that he thought that her condition had been worsening over time and he recommended surgery the following day to prevent further worsening. Depo. of Dr. Todd Vanderheiden, 91:7-23, copy attached as **Exhibit 11**. Dr.

Vanderheiden further testified that the delay from the time of the October 2012 MRI until her surgery could alter her neurological recovery, including a stepwise decrease in function, which was his impression when he saw Plaintiff in May 2013. *Id*. at 93:17-95:4.

## STATEMENT OF ADDITIONAL DISPUTED FACTS

34.     The above facts lead Ms. Trujillo's medical expert witness, Dr. Kennon Tubbs, to opine, among other things, that the City and County of Denver (through the health care professionals it contracted with from Denver Health and Hospital Authority, including the Nurse Defendants) were repeatedly indifferent to Trujillo's serious acute medical need and willfully deviated from the standards for health services in correctional setting. **Ex. 2** at ¶ 11.

35.     The Nurse Defendants failed to timely order radiographic testing. *Id*. at ¶ 12.

36.     The Nurse Defendants failed to schedule a timely MRI, follow up on, or evaluate MRI results as an acute, ongoing process requiring emergent evaluation. *Id*. at ¶ 13; **Ex. 1** at ¶¶ 12-17.

37.     The Nurse Defendants failed to follow Stroke Protocols. **Ex. 2** at ¶ 14.

38.     The Nurse Defendants failed to follow up with neurology in a timely manner after an MRI was obtained on October 10, 2012. *Id*. at ¶ 15; **Ex. 1** at ¶ 21.

40.     The Nurse Defendants failed to appropriately and timely refer Ms. Trujillo to a neurosurgeon despite a recommendation from neurology consultant, Dr. Maa, and Ms. Trujillo's March 21, 2013 medical kite requesting the neurosurgery appointment be made. **Ex. 2** at ¶ 16.

41.     The Nurse Defendants blocked Ms. Trujillo's access to care by failing to make timely, required medical appointments with rheumatology, neurology, radiology, and neurosurgery, including "ASAP" and "urgent" as ordered. *Id*. at ¶ 17; **Ex. 1** at ¶¶ 18-23.

42.    The Nurse Defendants failed to provide Trujillo with the exact diagnosis and cause of her neurologic deficits. **Ex. 2** at ¶ 18; **Ex. 1** at ¶ 24.

43.    The Nurse Defendants failed to admit to hospital and emergently evaluate the acute neurologic change in Ms. Trujillo's status, causing negative progression of symptoms and worsening of gait and self care over several weeks. **Ex. 2** at ¶ 19.

44.    The Nurse Defendants failed to provide adequate, timely and compassionate care for a significant neurologic illness in a correctional setting. *Id.* at ¶ 20; **Ex. 1** at ¶¶ 28-29.

45.    The Nurse Defendants were deliberately indifferent to the serious medical need of requiring neurosurgical evaluation in a timely manner. *Id.*; **Ex. 2** at ¶ 21.

46.    Although several nurses admitted that it was their responsibility to advocate for correctional patients to receive needed care, including follow up appointments (*see, e.g.*, **Ex. 13**, 181:3-182:3), nurses did nothing more than put orders in an "appointment board" and rely on a tech to actually schedule the appointment. *See* Exhibit 4, 103:4-104:6, 104:12-24 (Q. So when you agreed that it's a nurse's job to advocate for a patient, what do you think that that includes? A. If there's an appointment that needs to be scheduled, I will schedule that appointment. Q. And that's it? A. That's it. Q. You put it on the appointment board and then you're done? A. Yes. Q. And that's advocating for a patient? A. Yes.). In addition, nurses did not follow up to verify that appointments were timely made—or even made at all. *Id.*; *see also*, **Ex. 1** at ¶¶ 12-18.

## STANDARD OF REVIEW

Summary judgment is only appropriate if there are the no genuine issues of material facts and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56; *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). "The presence of factual disputes . . . will

preclude granting of summary judgment . . . if the disputes are genuine and concern material facts." *Watson v. City of Kansas City, Kan*., 857 F.2d 690, 694 (10th Cir. 1988). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998). A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Watson*, 857 F.2d at 694.

Because the Nurse Defendants have moved for summary judgment but do not bear the burden of persuasion at trial, the Nurse Defendants must make a prima facie demonstration that Ms. Trujillo lacks evidence on an essential element of her claim. *Adler*, 144 F.3d at 669. If the Nurse Defendants meet this burden, Ms. Trujillo can defeat summary judgment by demonstrating "specific facts showing that there is a genuine issue for trial." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Ms. Trujillo can "establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp*., 252 F.3d 1111, 1115 (10th Cir. 2001). When reviewing a motion for summary judgment, a court must view the factual record and draw all reasonable inferences therefrom most favorably to the nonmoving party. *Adler*, 144 F.3d at 670. In a case involving a claim of deliberate indifference to serious medical needs, "a court may not grant summary judgment" "[w]here disputed material facts implicate either of the two questions of whether a serious medical need existed or whether an officer was deliberately indifferent to it." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

When, as in this case, a defendant invokes the defense of qualified immunity on summary judgment, the nonmoving party will defeat summary judgment by demonstrating: "(1) that the

defendant's actions violated a constitutional or statutory right and (2) that the right was clearly established at the time of the defendant's unlawful conduct." *York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008). However, "[u]nless the defendant demonstrates that there is no disputed issue of material fact relevant to the immunity analysis, a motion for summary judgment based on qualified immunity must be denied." *Myers v. Koopman*, 2011 WL 650328, at *2 (D. Colo. Feb. 11, 2011) (citing *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir. 1991)).

# ARGUMENT

I.     **The Nurse Defendants Violated Ms. Trujillo's Eighth Amendment Rights Because They Were Deliberately Indifferent to Her Serious Medical Needs.**

"A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). "Deliberate indifference" involves both an objective and a subjective component. *Id.* The objective component is met if the deprivation is "sufficiently serious." *Id.* A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* The subjective component is met if the defendant "knows of and disregards an excessive risk to inmate health or safety." *Id.*

Moreover, the Tenth Circuit recognizes two types of conduct constituting deliberate indifference. First, a medical professional's failure to treat a serious medical condition properly. *Id.* at 1211. Second, deliberate indifference occurs when medical professionals prevent an inmate from receiving treatment or deny her access to medical personnel capable of evaluating the need for treatment. *Id.* This second category of deliberate indifference arises because medical professionals like the Nurse Defendants serve as "gatekeeper[s] for other medical personnel

capable of treating [an inmate's] condition." *Id.* When medical professionals refuse or delay in "fulfill[ing] that gatekeeper role," they are liable for deliberate indifference from denying access to medical care. *Id.*

### A. Ms. Trujillo Satisfies the Deliberate Indifference Objective Component Because Her Medical Condition was Sufficiently Serious.

Ms. Trujillo's spinal cord injury and related medical conditions were "sufficiently serious" such that the she satisfies the objective component. The objective component inquiry is not limited "exclusively by the symptoms presented at the time the prison employee had contact with the prisoner." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). Instead, in the Tenth Circuit, "the question raised by the objective prong of the deliberate indifference test is whether the alleged harm [such as a severe spinal cord injury] . . . is sufficiently serious (which it undoubtedly is), rather than whether the symptoms displayed to the prison employee are sufficiently serious." *Id.*

Shortly after Ms. Trujillo's injured her spine on July 4, 2012, she suffered from repeated falls, severe back pain, numbness and tingling in her extremities, loss of grip, altered gait, and bowel incontinence. *See*, *e.g.*, Nurse Ex. BB, H, L, and M. Although "not every twinge of pain suffered as the result of delay in medical care is actionable," Ms. Trujillo's evidence of ongoing, untreated neurological symptoms, as well as related pain and suffering, goes well beyond a "twinge," lasted close to tenth months, and is sufficient to establish the objective element of the deliberate indifference test. *Mata*, 427 F.3d at 755; *see also Sealock*, 218 F.3d at 1210.

Indeed, in July 2012, Ms. Trujillo's outward symptoms of unsteadiness, altered gait, and falls were "sufficiently serious" that they were recognized by a lay person. On July 25, 2012, Deputy Kaipat-Jones observed Ms. Trujillo's poor medical condition, felt compelled to help

Ms. Trujillo undress, shower, and redress to prevent her from falling. **Exhibit 12.** Deputy

Kaipat-Jones was so concerned that she alerted her supervisors of the situation stating: "She

[Ms. Trujillo] NEEDS HELP BADLY . . . I wanted to bring this to your attention because it can

be a big LIABILITY . . . Her balance is totally off." *Id.* (emphasis in original).

> Even before Ms. Trujillo's precise spinal cord injuries were diagnosed by Dr. Maa in
February 2013, Ms. Trujillo was in fact suffering from a spinal injury as evidenced by her visible
and communicated signs of medical need. Moreover, as discussed in detail below, as early as
August 10, 2012 Ms. Trujillo's medical chart noted a neurological illness requiring "urgent"
consultations, "ASAP" follow-up tests, and potential surgery. Nurse Exs. T, V, AA. Therefore, at
the critical times when the three Nurse Defendants had direct contact with Ms. Trujillo, she was
suffering from a "sufficiently serious" medical condition diagnosed by a physician as mandating
treatment. *See Sealock*, 218 F.3d at 1210. She satisfies the objective component.

### B. Ms. Trujillo Satisfies the Deliberate Indifference Subjective Component Because the Nurse Defendants Knew Ms. Trujillo Needed Medical Care and Deliberately Delayed or Denied Access to Care.

> Although the subjective component requires Ms. Trujillo to present evidence of the Nurse
Defendants' "culpable state of mind," Ms. Trujillo is not required to show that the Nurse
Defendants possessed an "express intent to harm." *Mata*, 427 F.3d at 752. In other words,
Ms. Trujillo "need not show that [the Nurse Defendants] acted or failed to act believing that
harm actually would befall [Ms. Trujillo]; it is enough that the [Nurse Defendants] acted or failed
to act despite . . . knowledge of a substantial risk of serious harm." *Id.* And contrary to the Nurse
Defendants' assertion, Ms. Trujillo is not required to present evidence as to the Nurses'
"mindset" or "thought process." *See* Dkt. No. 211 at 17–18. The Nurse Defendants' " intent can

be demonstrated through circumstantial evidence." *Mata*, 427 F.3d at 752.

      **1.**    **The Nurse Defendants Deliberately Ignored Doctors' Medical Directives to Provide Medical Follow-up and Treatment.**

There is ample circumstantial evidence showing that the Nurse Defendants knew of Ms. Trujillo's serious medical condition and the doctor-determined need for "urgent" medical care but nonetheless failed to fulfill their "gatekeeper" function to ensure that she received that care. *See Ancata v. Prison Health Servs.*, Inc., 769 F.2d 700, 704 (11th Cir. 1985) ("Intentional failure to provide service acknowledged to be necessary is the deliberate indifference proscribed by the Constitution."). As an initial matter, Dr. Crum's speculation that Plaintiff was a malingerer was enough alone to taint the Nurse Defendants' subjective view of her. **Ex. 1** at ¶ 25.

In addition, on August 10, 2012 after Ms. Trujillo saw Dr. Boyle for a rheumatoid arthritis consultation, Nurse Defendant Toliver noted Dr. Boyle's recommendation that Ms. Trujillo receive an "urgent neurologic consult" for her medical condition. SOF ¶ 22; **Ex. 3**. However, Nurse Defendant Toliver did not take any action, beyond requesting an appointment through the ineffective and unreliable "appointment board," to ensure that Ms. Trujillo received the needed follow-up consultation. *See* **Exhibit 4,** 65:15-67:19, 70:15-71:4, 72:13-76:4; **Exhibit 13,** Depo. of Carmen Kassatley, 136:1-18.

In August and September 2012, Nurse Defendant Perez had access to Ms. Trujillo's medical chart, made "chronic charting" entries noting Ms. Trujillo was in pain and a fall risk; nonetheless, he took no action to schedule the neurological consultation that Dr. Boyle recommended. *See* Nurse Ex. T; **Ex. 8**. As a result of Nurse Defendant Toliver's and Nurse Defendant Perez's inaction, Ms. Trujillo waited close to one month to receive an "urgent" neurologic consultation. **Ex. 1** at ¶¶ 9-14; **Ex. 2** at ¶ 7.

On September 12, 2012 after Ms. Trujillo finally saw Dr. Hughes, Nurse Defendant Wimberly noted that he recommended an "ASAP" MRI; however, Nurse Defendant Wimberly failed to ensure that Ms. Trujillo was scheduled for an urgent MRI. SOF ¶ 24, **Exhibits 5 and 6**. As a result nearly one month passed before Ms. Trujillo received an MRI on October 10, 2012. Nurse Ex. W; **Ex. 2** ¶ 7. Upon Ms. Trujillo's return to the jail from receiving the MRI, Nurse Defendant Wimberly affirmatively noted in Ms. Trujillo's medical chart that Ms. Trujillo did <u>not</u> need a follow up appointment. SOF ¶ 26-28; **Ex. 9.**

In January 2013 when Ms. Trujillo still had not seen a doctor to discuss the results of her MRI, Nurse Defendant Perez continued to make entries in Ms. Trujillo's medical chart noting only "chronic charting." **Ex. 8.** He did not provide any medical treatment or schedule a follow up appointment with a doctor despite the MRI results showing a severe spine injury.

Therefore, the evidence shows that the Nurse Defendants, after Dr. Crum placed his August 1, 2012 "malingering" speculation in her chart, deliberately disregarded written medical directives and failed to provide Ms. Trujillo with doctor-ordered medical care despite knowledge of a substantial risk of serious harm .

##### 2. The Nurse Defendants Independently Failed to Provide Treatment for Ms. Trujillo's Serious Medical Needs.

Once Ms. Trujillo was housed in the DDC infirmary, the Nurse Defendants regularly observed Ms. Trujillo and her medical condition. During this time, Ms. Trujillo was in pain, falling, using a walker or wheelchair, suffering from numbness and tingling in her limbs, headaches, dizziness, and urinary and bowel incontinence. Nurse Exs. V, Z, AA. Yet the Nurse Defendants did not take any action to detect Ms. Trujillo's spinal injury or assess her serious need for medical care. **Ex. 1** ¶¶ 23-29.

16

Indeed, the Nurse Defendants failed to assess, detect, and seek a doctor's opinion on Ms. Trujillo's symptoms despite having access to and being trained on Denver Health's nursing protocol for back pain. [3] Back Pain Protocol, marked as **Exhibit 14** ; **Exhibit 15**, 86:21-87:24. Specifically, the Back Pain nursing protocol provides that if an inmate is suffering from "numbness or tingling in the extremities" or the "inability to hold bowels or bladder," then the nurse must "notify MD." **Ex. 14.** "While published requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm." *Mata*, 427 F.3d 745, at 757.

### 3. The Nurse Defendants Provided Inadequate Medical Care While Ms. Trujillo Was Housed in the Medical Infirmary.

When Ms. Trujillo was housed in the medical infirmary the Nurse Defendants provided only cursory medical care that amounted to no treatment at all. For example, when Ms. Trujillo was twice found to have fallen on the floor as a result of her spinal injury, Nurse Defendant Perez did nothing more than tell Ms. Trujillo to use the call light for assistance. Nurse Ex. R. He and the other Nurse Defendants made no effort to assess the reasons for Ms. Trujillo's falls or the need for medical care. *See* SOF ¶¶ 26-28; **Ex. 1** ¶¶ 23-29. Such actions, in the case of serious medical problems, violate the Eighth Amendment. *Ancata*, 769 F.2d at 704; *see also West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978).

### II. The Nurse Defendants' Medical Causation Argument Must Be Rejected; a Jury Could Conclude that the Delay in Treatment Occasioned by the Nurse Defendants' Inaction Prolonged Ms. Trujillo's Pain and Suffering.

To the extent Nurse Defendants' make a causation-based argument that their failures to

---

[3] It is irrelevant that a nurse is not medically trained or authorized to "diagnose" or "prescribe." *See* Dkt. No. 211 at 16. Nurses are trained to asses and evaluate a patient's health status, to prioritize patient needs, and to act as a patient advocate. **Exhibit 1** ¶ 7.

provide timely access to medical case did not "cause" Ms. Trujillo any injury, this argument also

must fail. Although the Nurse Defendants did not cause Ms. Trujillo's spinal cord injury (she

was injured in an accident while using a floor buffer), there is factual evidence from which a jury

could conclude that the delays occasioned by the Nurse Defendants' actions and inactions

"unnecessarily prolonged [Ms. Trujillo's] pain and suffering." *Sealock*, 218 F.3d at 1210, n.5.

Moreover, Ms. Trujillo's constitutional claims are not as narrow as the Nurse Defendants

imply. This case is not solely about whether Ms. Trujillo's current medical condition would be

improved if she received spinal surgery immediately after her injury. This case is also about the

physical pain, mental anguish, and suffering that Ms. Trujillo endured for over ten months. *See*

First Am. Compl., Doc. No. 99 at ¶¶ 91-92. The Nurse Defendants' singular focus on the need

for medical expert testimony to prove that Ms. Trujillo's medical condition would be better now

if she had surgery sooner is a red herring. No expert medical testimony is needed on that point

for Ms. Trujillo to prevail at trial on her deliberate indifference claim.[4]

Indeed, the first case cited by the Nurse Defendants actually reversed a grant of summary

judgment, finding that the subjective component was satisfied where the plaintiff "did not

present specific medical evidence of damage to his [health] resulting from the delay" and,

instead, the plaintiff presented "general evidence that time is of the essence" when someone is

experiencing the medical condition suffered by the plaintiff. *Sealock*, 218 F.3d at 1210.

Similarly, the Nurse Defendants' reliance on *McCarthy v. Weinberg*, 753 F.2d 836, 839

(10th Cir. 1985), is misplaced because the court actually affirmed denial of summary judgment

---

[4] Even if it were, Ms. Trujillo's treating surgeon, Dr. Vanderheiden, has opined that her medical
condition immediately before her surgery was "worsening" since July 2012. SOF ¶¶ 32-22; **Ex.
11**, 91:7-95:4. Ms. Trujillo's medical expert, Dr. Tubbs, also provided an opinion that the delay
in Ms. Trujillo's care resulted in permanent deficits that could have been avoided. **Ex. 2** ¶ 9.

on the inmate's deliberate indifference claim. Summary judgment was denied based primarily on an affidavit submitted by the pro se plaintiff. *Id.* at 837. The court's reference to expert testimony for complex medical issues was nothing more than *dicta* in the court's analysis of whether the pro se litigant was deprived of counsel at trial. *Id.* at 839.

The remaining cases cited by the Nurse Defendants are irrelevant. They involve traditional negligence actions in which the cause of the alleged injuries was contested. *See Mathison v. United States*, 2015 WL 854476, at *2 (D. Colo. Feb. 26, 2015) (negligence action for hearing loss brought under the Federal Tort Claims Act); *Franklin v. Shelton*, 250 F.2d 92, 95 (10th Cir. 1957) (negligence action brought for car accident injuries); *Duke v. Garcia*, 2014 WL 1333151, at *1 (D.N.M. Feb. 28, 2014) (negligence action against a car repossession employee for injuries sustained when employee pushed plaintiff).

The only on-point case cited by the Nurse Defendants—*Sealock*—found that expert medical testimony was not necessary to show that a delay in treatment caused harm to the inmate. *Sealock*, 218 F.3d at 1210 & n.5. Therefore, the Nurse Defendants' argument regarding medical causation expert testimony must be rejected.

## III.    The Defendant Nurses are Not Entitled to Qualified Immunity.

The Nurse Defendants are not entitled to summary judgment on their claim of qualified immunity because Ms. Trujillo can demonstrate (1) that the Nurse Defendants' actions and inactions violated a constitutional right and (2) that the right was clearly established at the time of the Nurse Defendants' unlawful conduct. *York*, 523 F.3d at 1209. Moreover, the Nurse Defendants cannot "demonstrate that no material issues of fact remain as to whether the [Nurse Defendants'] actions were objectively reasonable in light of the law and the information the

[Nurse Defendants'] possessed at the time of [their] actions." *Salmon*, 948 F.2d at 1136.

Viewing the facts most favorable to Ms. Trujillo, the three Nurse Defendants violated Ms. Trujillo's constitutional right to be free from cruel and unusual punishment and to have access to medical care while incarcerated. *See supra* Section I. Therefore, Ms. Trujillo satisfies the first prong.

In the Tenth Circuit "there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata*, 427 F.3d at 749; *see also Olsen*, 312 F.3d 1304 ("The right to custodial medical care is clearly established."). Tenth Circuit case law clearly defines medical professionals' roles as the "gatekeeper" for access to medical treatment. *Mata*, 427 F.3d at 751; *Sealock*, 218 F.3d at 1211. The refusal or delay in fulfilling that "gatekeeper" role is undoubtedly a constitutional violation. *Id.*; *see also Ancata*, 769 F. 2d at 704 ("Intentional failure to provide service acknowledged to be necessary is the deliberate indifference proscribed by the Constitution.").[5] Therefore, Ms. Trujillo satisfies the second prong and the Nurse Defendants' Qualified Immunity defense must fail.

## CONCLUSION

For the foregoing reasons, the Court should deny the Nurse Defendants' motion for summary judgment.

---

[5] Presumably, that is why Denver Health has a policy addressing inmates' rights to access to care and why the Nurse Defendants were specifically informed of this policy during orientation. City Exhibit F; 30(b)(6) depo. of Jennifer Firebaugh, **Exhibit 16**, 31:12-25. The Nurse Defendants cannot claim to be ignorant of Ms. Trujillo's right to access medical care for serious medical needs while incarcerated.

DATED: July 31, 2017

Respectfully submitted,

*s/ J. Lee Gray*

Kathleen K. Custer
Jessica Smith
Kristina R. Van Bockern
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO  80202
Phone: (303) 295-8060
KKCuster@hollandhart.com
JJSmith@hollandhart.com
TRVanBockern@hollandhart.com

J. Lee Gray
HOLLAND & HART LLP
6380 S. Fiddlers Green Cir., Suite 500
Greenwood Village, CO 80111
Phone: (303) 290-1602
Fax: (303) 975-5303
LGray@hollandhart.com

**ATTORNEYS FOR MS. TRUJILLO**

**CERTIFICATE OF SERVICE**

I certify that on July 31, 2017, I served the foregoing electronically via email on the following parties or counsel:

Conor D. Farley
Cristina P. Helm
Denver City and County Attorney's Office
conor.farley@denvergov.org
cristina.helm@denvergov.org
*Attorneys for Defendants City and County of Denver*

Patrick A. Singer
psinger@kresljohnson.com
*Attorney for Defendants Anthony Perez, RN; Victoria Toliver, RN;
Dana Wimberly, RN;*

*s/ J. Lee Gray*

10046942_1