IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-2798

REBECCA TRUJILLO,

    Plaintiff,

v.

CITY AND COUNTY OF DENVER, et al.,

    Defendants.

---

**DECLARATION OF KENNON C. TUBBS, M.D., CCHP-P**

---

STATE OF UTAH   )
                           )
COUNTY OF Salt Lake )

**(This Declaration is made under the provisions of 28 U.S.C. § 1746)**

I, Kennon C. Tubbs, M.D., being over the age of 18, state as follows:

1. I am a family practice physician and have practiced at the Utah State Prison for 17 years. I am currently the Medical Director for eleven county jails throughout Utah and Wyoming. I am a certified provider by the National Correctional Commission on Health Care (CCHC-P). I supervise three Physician Assistants who provide the majority of patient care at these facilities and have extensive experience with providing patient care and medical supervision of correctional facilities. I understand the expectation of care to be provided by nursing staff, mid-level providers, and physicians in the correctional setting. As part of my experience and work history, I understand and regularly apply the National Commission on Correctional Health Care standards for health services in jails.

**EXHIBIT 2**

2. I have reviewed the medical records for Rebecca Trujillo, as well as deposition transcript and expert witness reports in this matter. I also personally interviewed Ms. Trujillo regarding this matter. To date, I have issued three expert witness reports in this matter.

3. I have the expertise to evaluate the accuracy and reliability of the medical records in this case. These records are the type usually relied upon by reviewers such as myself. These records appear to be reliable. As correctional medicine becomes increasingly complex it is important for reviewers, like myself, to keep the documented interaction between a patient, healthcare institution, and providers at the heart of the review process. While it is true to some extent all patient interactions are unique, there are specific medical practices a treating physician would be expected to provide to meet the applicable standard of care. I have specifically reviewed these records to evaluate, within a reasonable degree of medical certainty, the standard of care with respect to treatment of Ms. Trujillo while incarcerated at the Denver Jail.

4. On July 23, 2012 Trujillo was seen for laboratory review. This Progress Note shows that all lab studies were normal, including a normal rheumatoid factor (RF). Trujillo continued to complain of chronic pain, tingling, and paresthesias. A referral to rheumatology was again made despite a normal RF.

5. Based on my review of the medical records and other information in this case, I have formed the following opinions a reasonable degree of medical certainty.

6. Trujillo's acute neurologic change in status shortly after her injury, including multiple falls, an unsteady gait, weakness in hands and legs and being unable to clean herself, should have been investigated emergently for neurologic deficits. The nursing staff confirmed these falls and neurologic deficits but did not act to investigate them. A significant neurologic change requires emergency imaging with MRI and CT Scans, as well as an emergent neurology consult. She was seen by neurology 71 days after first complaining of "falling five or six times".

An MRI was obtained 97 days after she first reported symptoms. These are significant delays in standard of care for evaluation of acute neurologic change.

7. The neurologist was first seen on September 12th, 2012 (32 days after an "urgent consult" was ordered by Dr. Boyle) and an "ASAP" MRI was obtained another 29 days later. If the MRI could not have been scheduled within a few days after it was ordered, an emergency room visit for MRI evaluation would have been warranted. After the MRI was completed, no neurology follow up to discuss these findings was scheduled. It is a correctional physicians' responsibility to communicate with the specialist both in writing and verbally to discuss radiologic findings, treatment options, plan of care, and appropriate follow up appointments. No jail physician contacted the neurologist or followed up with radiographic MRI study findings. No attempt was made to discuss the MRI findings with Trujillo or to create a treatment plan for her new onset of weakness and neuropathies.

8. Cord Compression and Edema is reversible if treated in a timely manner. An urgent Neurosurgery consult was requested in February 2012 by a neurologist, Dr. Maa. As shown in the October 10, 2012 radiology report, Trujillo did have a surgical problem with cord compression that required an anterior cervical fusion. The request by neurology to see neurosurgery was not scheduled. A month later, Trujillo's request on March 21, 2013 to see neurosurgery was also ignored. She had significant findings on neurologic exam during Dr. Maa's visit, such as "left claw hand" and bilateral extremity weakness.

9. On April 4, 2013, Trujillo was given a yearly review and physical exam, which noted no neurologic deficits or complaints despite the fact that she had gone from fully functioning in June 2012 to wheelchair-bound with a left claw hand on April 4th 2013. This notes the very low degree of concern that the nursing staff had for Trujillo. This disregard was

3

also found in jail physicians. Dr. Gehred reviewed the inadequate physical done by the nursing staff in April2013 and stamped it with his stamp with no further comment, thereby agreeing that she required no further treatment, or care by neurosurgery. He also agreed that the exam was normal despite the many findings that were present prior to and after the exam was done as well as the abnormal MRI findings that found spinal stenosis. That is, Dr. Gehred ignored MRI findings, neurology instructions to follow up with neurosurgery, and failed to do an exam on a patient who was wheelchair bound and housed in the infirmary in lieu of the minimal nursing exam that was done on April 4, 2013.

10. Had Trujillo had the necessary spinal surgery in July 2012 when her spinal injury occurred, her deficits would likely be minimal to none. Due to the delay in obtaining appropriate neurology, radiology, and neurosurgery consults the compression caused permanent deficits that would have been avoided.

11. It is my professional opinion that the City and County of Denver (through the health care professionals it contracted with from Denver Health and Hospital Authority, including the Nurse Defendants) repeatedly were indifferent to Trujillo's serious acute medical need and willfully deviated from the standards for health services in correctional setting. Therefore the medical care that was provided was inadequate to treat her serious medical condition.

12. The jail health care professionals, including Nurse defendants, failed to order radiographic testing in a timely manner.

13. The jail health care professionals, including Nurse defendants, failed to schedule timely MRI, follow up on, or evaluate MRI results as an acute, ongoing process requiring emergent evaluation.

14. The jail health care professionals, including Nurse defendants, failed to follow Stroke Protocols.

15. The jail health care professionals, including Nurse defendants, failed to follow up with neurology in a timely manner after an MRI was obtained on October 10, 2012.

16. The jail health care professionals, including Nurse defendants, failed to appropriately and timely refer Plaintiff to a neurosurgeon despite a recommendation from neurology consultant, Dr. Maa, and Trujillo's March 21, 2013 medical kite requesting the neurosurgery appointment be made.

17. The jail health care professionals, including Nurse defendants, blocked Trujillo's access to care by failing to make timely, required medical appointments with rheumatology, neurology, radiology, and neurosurgery, including "ASAP" and "urgent" as ordered.

18. The jail health care professionals, including Nurse defendants, failed to provide Trujillo with the exact diagnosis and cause of her neurologic deficits.

19. The jail health care professionals, including Nurse defendants, failed to admit to hospital and emergently evaluate the acute neurologic change in Trujillo's status, causing negative progression of symptoms and worsening of gait and self-care over several weeks.

20. The jail health care professionals, including Nurse defendants, failed to provide adequate, timely and compassionate care for a significant neurologic illness in a correctional setting.

21. The jail health care professionals, including Nurse defendants, were deliberately indifferent to the serious medical need of requiring neurosurgical evaluation in a timely manner.

22. The City and County of Denver's appointed health care authority for the jail, including the Nurse Defendants, did not provide adequate, prudent, and necessary care as

required in a correctional setting. It is my opinion that these breaches in care caused a delay in the diagnoses of Rebecca Trujillo cervical spinal injury. As a direct and proximal result of the inadequate care provided by the jail's medical staff, including the Nurse Defendants, Trujillo subsequently suffered a fibular fracture due to lack of mobility and altered gait. She has experienced chronic pain in lower extremities with permanent gait deficits, requiring use of a wheeled walker and AFO (ankle foot orthosis) or walker boot. She also has been diagnosed with continuing permanent neuropathies and sensation disturbances in both upper and lower extremities, as well as bowel and bladder dysfunction and intermittent incontinence. She has had a deterioration of her mental health to include worsening of her depression and alcoholism due to her new neurologic deficits.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 31, 2017.

_____
Kennon C. Tubbs M.D., CCHP-P