1

```
 1           IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:14-cv-02798-RBJ-MEH
 3   _____

 4   DEPOSITION OF:   TODD VANDERHEIDEN, M.D.
                     March 23, 2017
 5   _____

 6   REBECCA TRUJILLO,

 7   Plaintiff,

 8   v.

 9   CITY AND COUNTY OF DENVER, et al.,

10   Defendants.
11   _____

             PURSUANT TO NOTICE, the deposition of
12   TODD VANDERHEIDEN, M.D., was taken on behalf of the
     Plaintiff at 777 Bannock Street, Suite B176, Denver,
13   Colorado 80204, on March 23, 2017 at 2:36 p.m., before
     Tracy R. Stonehocker, Certified Realtime Reporter,
14   Registered Professional Reporter and Notary Public
     within Colorado.
15

16

17

18

19

20

21

22   H+G

23

24   Hunter+Geist, Inc.

25   303.832.5966        1900 Grant Street, Suite 1025    ▪ www.huntergeist.com
     800.525.8490        Denver, CO 80203                 ▪ scheduling@huntergeist.com

                         Your Partner in Making the Record
```

Exhibit 11

Case No. 1:14-cv-02798-RBJ-MEH   Document 217-11   filed 07/31/17   USDC Colorado
pg 2 of 3

TODD VANDERHEIDEN, M.D. - 3/23/2017
Rebecca Trujillo v. City and County of Denver, et al.

89

1  to that circle?
2      A. Sure.
3      Q. Is that pen not really working?
4      A. Not very well.
5      Q. Let's try blue. Might have better luck.
6      A. Okay.
7      Q. Much better. And I think you were also
8  pointing out the --
9      A. This is the Klippel-Feil here.
10     Q. Would you mind circling that and put a
11 number 3 next to that?
12     A. Uh-huh.
13     Q. How about --
14     A. Spinal cord injury?
15     Q. Yes, please.
16     A. That's best seen here. That's number 5.
17     Q. Okay.
18     A. C4-5 spondylolisthesis, diagnosis number
19 4, is seen on both of them. It's the alignment
20 problem between this area of the spine and this area
21 of the spine. It's that stairstep right here.
22     Q. Okay.
23     A. That's diagnosis 4.
24     Q. Can you tell whether that predated July
25 2012?

90

1      A. As I stated previously, indeterminate.
2  There may be a combination of preexisting spondylosis
3  exacerbated by an event, so could be a combination of
4  degenerative and some sort of injury and that was kind
5  of when I gave you my impression of the overall
6  scenario.
7      Q. Okay. Yes. I remember. For purposes
8  of being complete, could you circle diagnosis number
9  1?
10     A. That can't be --
11     Q. That can't be circled?
12     A. That's a clinical syndrome. So
13 myelopathy is -- the direct Latin translation is myel
14 meaning spinal and pathio meaning problem, so it's a
15 spinal cord problem. It's pretty vague.
16     Q. It's a very broad term?
17     A. It's a broad term and it -- although
18 when someone says cervical myelopathy, we immediately
19 start thinking of a constellation of symptoms that
20 would comprise the clinical syndrome.
21     Q. Okay. I'm trying to think if we missed
22 anything -- 2, 3, 4, 5 --
23     A. Number 6 is the stenosis, that's just
24 the narrowing of the spinal canal, so, for example,
25 here it's this wide and here it's this wide, which is

91

1  much narrower.
2      Q. I believe that you testified that that's
3  indeterminate as well when the onset of that could
4  have occurred, correct?
5      A. Correct. Although my impression is as I
6  indicated previously.
7      Q. Okay. So we talked about this in the
8  beginning, but we didn't really finish it out. You
9  recommended that she be admitted to the hospital that
10 day and perform the surgery tomorrow. That's what it
11 states?
12     A. In my initial evaluation, yeah.
13     Q. Did you consider this to be an urgent
14 need for surgery?
15         MR. SINGER: Object to the form of the
16 question.
17         MR. FARLEY: Join.
18     A. I think when I analyzed her situation
19 that day first meeting her, my impression was that she
20 had been worsening and my goal was to prevent further
21 worsening, so I tried to counsel her on a more urgent
22 type of -- excuse me, a surgery in a more urgent
23 fashion so as to facilitate that.
24     Q. (BY MS. CUSTER) Okay. In your opinion,
25 should surgery have been recommended and performed

92

1  sooner than it was?
2          MR. SINGER: Object to form and
3  foundation.
4          MR. FARLEY: Join.
5      A. I think if I could answer the question
6  like this, I believe I did the right thing for the
7  patient. The minute I met her -- sorry -- strike that
8  from the record.
9          The day I met her is when I recommended
10 surgery, and my goal was to do it as soon as possible.
11     Q. (BY MS. CUSTER) Right. I wasn't trying
12 to imply that you had done something wrong. I meant
13 based on her history, is it your opinion that someone
14 else who had seen her should have recommended surgery
15 sooner?
16         MR. SINGER: Object to form and
17 foundation.
18     A. Well, I think if you follow the time
19 course of events here, she saw Dr. Boyle, who
20 correctly diagnosed a neurological problem. He sent
21 her to the neurologist. The neurologist agreed with
22 Dr. Boyle that there was a clearcut neurological
23 problem. Therefore an MRI was ordered and obtained.
24 The neurology team followed up on that and recommended
25 and facilitated or attempted to facilitate a referral

Case No. 1:14-cv-02798-RBJ-MEH    Document 217-11    filed 07/31/17    USDC Colorado
pg 3 of 3

TODD VANDERHEIDEN, M.D. - 3/23/2017
Rebecca Trujillo v. City and County of Denver, et al.

**93**

to the neurosurgeon. So the -- it seems like the course of events was reasonable. The timing -- I guess I would say it's unfortunate for Ms. Trujillo that each step along the way took quite awhile. So, you know, in a perfect world, she could have seen multiple doctors of different specialties in a shorter period of time, gotten all the proper tests and then had surgery in a reasonable amount of time.

Q. I believe you testified earlier that you thought a six-month delay after the October 10, 2012 MRI was an unreasonable amount of time for her to wait for surgery.

A. I would hope for the patient's sake that she could have seen a surgeon shortly after the MRI clearly demonstrated the reason for her neurological illness.

Q. Okay. Does a delay of this sort -- and let's just focus on from the October 10, 2012 MRI until May, does that length of a delay impact the effectiveness of the surgery that you performed or could it?

A. It could. Not necessarily. Sometimes we see neurological insults of this nature that over time show some improvement. Other times we see a stepwise decrease in function and further neurological

**94**

decline, so it's hard to predict, but because there is a chance of worsening, surgeons like me are proactive in trying to prevent the chance of worsening.

Q. Was it your assessment when you met Ms. Trujillo in May of 2013 that she had been worsening since she had last been seen?

A. That was my impression, yes.

Q. You said that it could affect the effectiveness of the surgery if there's a delay. How could it affect the effectiveness of a surgery given the length of the delay from October to May?

MR. FARLEY: Object to form and foundation.

A. It could alter the neurological recovery potential, so the chronically ill spinal cord may not respond as well to surgery as one that's less chronically ill. It's almost impossible to predict, but given the chance for worsening or lessened potential of recovery, then, again, the surgeons, like me, try to realign, stabilize and decompress the spine.

Q. What was your prognosis for Ms. Trujillo's recovery when you did recommend surgery for her in May 2013?

A. In a word, variable. And as I tell

**95**

patients with this condition, what I can do is three things, align your spine, stabilize your spine and decompress the spinal cord. The rest is up to the good Lord and time.

Q. Okay. I noticed in your May 16 report, you stated, "God willing, we'll be able to make a positive impact in her life." Is that -- that statement just struck me, so I wanted to ask you about that. Is that a statement that you frequently use in your charts with patients?

A. Almost every one.

Q. Okay. And why is that?

A. Because I'm a Christian and I believe that God has a hand in all the work that I do.

Q. Thank you. I appreciate that. Did the surgery that you performed in May of 2013 provide any relief to Ms. Trujillo's symptoms that she was experiencing at that time?

A. Yes, I believe they did.

Q. Did it improve her condition at that time?

A. I think so.

(Deposition Exhibit 9 was marked.)

Q. So it appears that this is a comparison of the MRI was that ordered by you on May 16, 2013 to

**96**

the MRI that occurred on October 10, 2012?

A. Yes. Agreed.

Q. Based on this or your review of the MRIs prior to the deposition today, did you notice any changes from October 2012 to the MRI in May 2013?

A. Looked about the same.

Q. Okay.

A. I think the impression reiterates that.

Q. So your conclusion that she was worsening was not based on the MRI, but it was based on other factors?

A. Symptoms.

(Deposition Exhibit 10 was marked.)

Q. It appears this is a -- so this is Exhibit 10. It appears this is when Ms. Trujillo returned to Denver Health and you assessed her again, correct?

A. Yes.

Q. And was your assessment of Ms. Trujillo's condition on May 21 the same as it was on May 16?

A. Yes.

Q. Was your recommendation the same?

A. Yes.

Q. And it states that -- this is on the