**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-2798-RBJ-MEH

REBECCA TRUJILLO,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
A. PEREZ, RN
V. TOLIVER, RN,
DANA WIMBERLY, RN,

      Defendants.

_____

**DEFENDANTS' MOTION TO LIMIT THE TESTIMONY OF
PLAINTIFF'S EXPERTS, KENNON TUBBS, MD AND JANE GRAMETBAUER, RN**
_____

The Nurse Defendants – Anthony Perez, RN, Victoria Toliver, RN, and Dana Wimberly, RN – by undersigned counsel of record, respectfully present their Motion to Limit the Testimony of Plaintiff's Experts, Kennon Tubbs, M.D. and Jane Grametbauer, RN, and as grounds, state as follows.

**Certification regarding conferral:** The undersigned confirms that he conferred with Plaintiffs' counsel on the matter in accordance with D.C.COLO.LCivR 7.1. Plaintiff opposes the requested relief.

I.      <u>INTRODUCTION</u>.

Rebecca Trujillo brought a section 1983 case alleging delay in treatment during her incarceration in the Denver jails from April 2012 to May 2013. She asserts that she fell and injured her spine on July 4, 2012. Am. Comp., Doc. 99, ¶ 38. Plaintiff further

claims that the "severe injury" to her spine made her an appropriate candidate for immediate cervical spine surgery, which she did not receive until after she was released from jail in May 2013. Am. Comp., Doc. 99, ¶¶ 72-73.

Plaintiff retained four experts to support her claim against the Defendant Nurses: Kennon Tubbs, M.D. (family practice physician), Jane Grametbaur, R.N. (correctional care nursing), Laura Woodard (rehabilitation counseling / life care planning), and Jeffrey Nehls (economist). **Exhibit A,** Plaintiff's Expert Disclosures. Notably, Plaintiff did not retain an expert in the specialties of neurology, neurosurgery, neuroradiology, or orthopedics. *Id.* For the reasons set forth below, certain expert opinions of Dr. Tubbs and Nurse Grametbaur are not relevant or reliable, and the Defendant Nurses request that the Court exclude such opinions at trial.

## II. <u>STATEMENT OF RELEVANT FACTS.</u>

1.     Plaintiff alleges that she sustained permanent neurologic and orthopedic injuries as a result of Defendants' deliberate indifference to her serious medical condition vis-à-vis their alleged failure to ensure she received timely cervical spine surgery. *See* Doc. 99, ¶¶ 1, 3, 84-89.

2.     Plaintiff's expert, Kennon Tubbs, M.D. is a family practice physician. Doc. 217-2, ¶ 1. He is not a neurosurgeon, nor is he qualified to offer criticisms in neuroradiology. *See* **Exhibit B,** Tubbs Deposition, 160:8-19.

3.     In his Declaration filed on July 31, 2017, Dr. Tubbs offered the following opinions irrelevant or unreliable opinions:

> a. **Standard of care** opinions with respect to Ms. Trujillo's treatment while incarcerated. Doc. 217-2, ¶ 3.

b. That there were significant delays in **standard of care** for evaluation of acute neurologic change.  Doc. 217-2, ¶ 6.

c. It is a correctional **physicians' responsibility** to communicate with the specialist both in writing and verbally to discuss radiologic findings, treatment options, plan of care, and appropriate follow up appointments.  Doc. 217-2, ¶ 7.

d. Based on the October 10, 2012 **radiology report**, Ms. Trujillo had a surgical problem with cord compression that required an anterior cervical fusion.  Doc. 217-2, ¶ 8.

e. Had Ms. Trujillo had the necessary **spinal surgery** in July 2012, **her deficits would likely be minimal to none**.  Due to the delay in obtaining appropriate neurology, radiology, and neurosurgery consults, **the compression caused permanent deficits that would have been avoided**.  Doc. 217-2, ¶ 10.

f. Defendants **failed to order radiographic testing** in a timely manner, and failed to schedule, follow up on, or **evaluate MRI results** as an acute, ongoing process requiring emergent evaluation.  Doc. 217-2, ¶¶ 12-13.

g. Defendant Nurses failed to timely **refer** Plaintiff to a neurosurgeon.  Doc. 217-2, ¶ 16.

h. Defendants' failure to appropriately treat Ms. Trujillo **caused a negative progression of symptoms** and **worsening of gait and self-care over several weeks**.  Doc. 217-2, ¶ 19.

i. These breaches in care **caused a delay in the diagnosis** of Plaintiff's cervical spine injury.  **As a direct and proximal result of the inadequate care provided by Defendants, Plaintiff suffered a fibular fracture due to lack of mobility and altered gait, and chronic pain in her lower extremities with permanent gait deficits requiring use of a wheeled walker and walker boot**.  Doc. 217-2, ¶ 22.

4.     Plaintiff's expert, Jane Grametbaur, R.N., is a registered nurse with experience in acute care and correctional care settings.  In that capacity, she had provided hands-on care to incarcerated patients suffering from a variety of medical and

psychiatric diagnoses.  Doc. 217-1, ¶¶ 1, 2.  However, Nurse Grametbaur is not trained or experienced in specialty treatment of spinal cord injuries.  Furthermore, Nurse Grametbaur is not familiar with the structure and operation of correctional care facility at issue in the present case.

5.      In her Declaration filed on July 31, 2017, Nurse Grametbaur offered the following irrelevant or unreliable opinions:

a.  Nurse Perez had a duty to perform a **full evaluation** of Plaintiff.  Doc. 217-1, ¶ 9.

b.  Plaintiff's symptoms were "**definitely neurological in nature,**" and required Nurse Perez to **advocate that she be evaluated emergently in the emergency room**.  His failure to perform an **in-depth chart review directly contributed to the long delay in diagnosis** of Plaintiff's spinal cord injury.  Doc. 217-1, ¶ 10.

c.  Nurse Perez used **chronic care charting**, which contributed to the delay in diagnosis and **ensured that no one would provide an in-depth evaluation of Plaintiff's "emergent neurological symptoms**." Doc. 217-1, ¶ 11.

d.  Nurse Toliver had a **duty to request clinic notes**, and the jail should have a mechanism to obtain copies in order for the jail provider to be able to follow specialist recommendations in a timely manner.  Doc. 217-1, ¶ 13.

e.  Nurse Toliver's **failure to obtain clinic notes and loss of Plaintiff's chart resulted in a significantly delay of her neurology appointment**, which contributed to the failure to timely diagnose and treat her acute spinal cord trauma.  Doc. 217-1, ¶ 14.

f.  Nurse Wimberly had a **duty to request clinic notes** and refer to the provider for review.  The jail should have a mechanism to obtain copies of all clinic notes and dictation **in order for the jail provider to be able to follow specialist recommendations in a timely manner**. Doc. 217-1, ¶ 16.

g.  Nurse Wimberly's **failure to obtain clinic notes resulted in a significant delay of the MRI and follow-up neurology appointment**,

which **contributed** to the failure to timely diagnose and treat Plaintiff's acute spinal cord trauma.  Doc. 217-1, ¶ 17.

h.  There seems to be no system to identify critical imaging results. Despite the fact that the results of the MRI were **grossly abnormal**, there is no indication that any jail provider reviewed the results.  **No one acted on the results**, since Plaintiff did not return to the neurologist until February 2013.  Doc. 217-1, ¶ 21.

i.  The medical records for Plaintiff indicate a **pervasive pattern among all medical providers** who cared for Ms. Trujillo of **callous indifference**.  Doc. 217-1, ¶ 23.

j.  The tone of **the note** (written by a nonparty doctor) and the assessment that Plaintiff may be "**malingering**" was **unprofessional and inappropriate**.   Suggesting that a patient was malingering, without using due diligence to rule out a physical cause for the patient's condition, creates bias among all care providers that is extremely damaging to the patient.  Doc. 217-1, ¶ 25.

k.  Plaintiff's **emergent symptoms of acute spinal cord injury required urgent surgery**, but were essentially ignored by all jail staff, including the Defendant Nurses, showing a clear pattern of callous disregard. Doc. 217-1, ¶ 28.

6.     Defendant Nurses request the Court exclude the opinions summarized in ¶¶ 3 and 5, *supra*, pursuant to the standards set forth in FED.R.EVID. 702, *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 597 (1993), and its progeny.

### III.     LEGAL STANDARD FOR ADMISSION OF EXPERT TESTIMONY.

The admission of expert testimony is governed by FED.R.EVID. 702.  In order to testify as an expert, the Court must find that 1) the expert's opinion is based upon sufficient facts or data; 2) the opinion is the product of reliable principles and methods; and 3) the expert has applied the principles and methods reliably to the facts of the case.  FED.R.EVID. 702.  In *Daubert*, 509 U.S. at 597, the Supreme Court held that the

Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

The objective of the "gatekeeping" requirement of *Daubert* and Rule 702 is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). The party offering the expert's opinion "must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements." *Goebel v. The Denver and Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003). "Under Daubert, any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999) (internal markup omitted).

Further, even if the Court finds the testimony to be reliable, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Rule 403 permits the trial court to exclude evidence if its probative value is outweighed by the danger of various concerns, including "wasting time" and "needlessly preventing cumulative evidence."" *Eller v. Trans Union, LLC*, 739 F.3d 467, 475 (10th Cir. 2013) (internal citations and quotation marks omitted); *Marsee v. United States*

*Tobacco Co.,* 866 F.2d 319, 324 (10th Cir.1989) (holding that trial court has discretion to exclude repetitive and cumulative expert testimony).

## IV.   DR. TUBBS' OPINIONS ARE NOT RELEVANT OR RELIABLE.

### A.   DR. TUBBS' STANDARD OF CARE OPINIONS ARE NOT RELEVANT.

Fed.R.Evid. 702 imposes a duty on the district court to ensure that expert testimony is relevant and reliable prior to admitting it.  *See Daubert*, 509 U.S. at 598.  In order to be relevant, the expert's testimony must "assist the fact-finder in understanding the evidence or determining a fact in issue."  *Hoffman v. Ford Motor Co.*, 493 Fed.Appx. 962, 975 (10th Cir. 2012).  Evidence is relevant when it has any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  FED.R.EVID. 401.  The Supreme Court described the consideration of whether an expert's testimony is relevant as one of "fit."  *Hoffman*, 493 Fed.Appx. at 975 (*citing Daubert*, 509 U.S. at 591).

> A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact.  Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant "fit."  . . . **Evidence appropriate for one purpose, therefore, may not be relevant for a different purpose, and it is the trial court's task to make this fitness determination**.

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2004)(emphasis added).

Dr. Tubbs' standard of care criticisms of the Defendant Nurses does not "fit" Plaintiff's Eighth Amendment claim.  The applicable inquiry in the present case is whether Defendants acted with deliberate indifference to a serious medical condition.

*See Sealock v. Colorado*, 218 F.3d 1205, 1209-10 (10th Cir. 2000).  This requires each Defendant to have possessed a "sufficiently culpable state of mind" to have inflicted cruel and unusual punishment.  *See Self v. Crum*, 439 F.3d 1227, 1230-31 (10th Cir. 2006).  When the facts, at best, indicate negligent diagnosis or treatment, the subjective component is not met.  *Id.* at 1231.  Instead, deliberate indifference is the key to establishing a constitutional violation.

> **Medical malpractice does not become a constitutional violation merely because the victim is a prisoner**.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence **deliberate indifference** to serious medical needs.  It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble*, 429 U.S. 97, 106 (1976)(emphasis added).  As a consequence, the relevant inquiry is whether each Nurse acted with "deliberate indifference," rather than whether they met standard of care.  Therefore, Dr. Tubbs' standard of care testimony does not "fit" Plaintiff's claims.

In his Declaration, Dr. Tubbs states:  "I have specifically reviewed these records to evaluate, with a reasonable degree of medical certainty, the **standard of care** with respect to treatment of Ms. Trujillo while incarcerated at Denver Jail."  Doc. 217-2, ¶ 3. He further criticizes the nursing staff, averring that there were "significant delays in **standard of care** for evaluation of acute neurologic change."   Doc. 217-2, ¶ 6. However, Dr. Tubbs' analysis applies an erroneous, less stringent standard that does not address the material issue in the case:  whether each Defendant Nurse acted with deliberate indifference to Plaintiff's alleged serious medical needs.  Standard of care testimony does not assist the jury in its determination of whether the nurses had a

sufficiently culpable mindset when they treated Plaintiff.  As a consequence, Dr. Tubbs'

opinion does not meet the relevance test that the Court must apply before permitting his

expert testimony on the topic at trial.

Similarly, Dr. Tubbs' opinions regarding physicians' responsibility are not

relevant.  *See* Doc. 217-2, ¶ 7.  Plaintiff did not sue any physicians in the present case.

Criticisms regarding the physicians' acts or omissions are not relevant to and do not "fit"

the issues in this case.  Unelucidated physician negligence is not imputable to

Defendant Nurses.  Furthermore, any expert testimony by Dr. Tubbs regarding the

physicians' responsibility would result in a risk of confusion of the issues and misleading

the jury, as well as undue delay and waste of time.  FED.R.EVID. 403.  The opinions of

Dr. Tubbs must be limited in this regard.

### B. DR. TUBBS' OPINIONS ARE NOT RELIABLE BECAUSE HE IS NOT QUALIFIED OR EXPERIENCED IN NEUROLOGY OR NEURORADIOLOGY.

To qualify as an expert, the individual must possess "'such skill, experience or

knowledge in that particular field as to make it appear that his opinion would rest on

substantial foundation and would tend to aid the trier of fact in his search for truth.'  The

heart of expert testimony is the *foundation.*"  *Lifewise Master Funding v. Telebank*, 374

F.3d 917, 928 (10th Cir. 2004)(internal citation omitted).  Proposed expert testimony

must fall within the reasonable confines of the witness's expertise."  *Conroy v. Vilsack*,

707 F.3d 1163, 1169 (10th Cir. 2013).  "**The simple possession of a medical degree**

**is insufficient to qualify a physician to testify as to . . . the medical causation of**

**spine-related ailments**."  *Alexander v. Smith & Nephew, P.L.C.*, 98 F.Supp.2d 1310,

1315 (N.D.Okla. 2000)(emphasis added)(board certified family practice physician not

qualified to give expert opinions regarding causation of spinal and neurological injuries).

The proponent of expert testimony bears the burden of demonstrating the expert's

qualifications.  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970, n.4 (10th

Cir. 2001).

Dr. Tubbs is a family practice physician.   Doc. 217-2, ¶ 1.   He has not

demonstrated that he has any training or experience in the specialties of neurology,

neurosurgery, or neuroradiology.  Despite his lack of training in these areas, Dr. Tubbs

offers causation opinions that the delay in diagnosis and treatment resulted in the

permanent neurologic deficits that Plaintiff allegedly suffered.  Dr. Tubbs further opines

that Plaintiff's alleged deficits could have been avoided with timely treatment.  *See* Doc.

217-2, ¶¶ 10, 19, 22.

During his deposition, Dr. Tubbs conceded that he is not qualified to criticize the

opinions of a neuroradiologist regarding the October 2012 radiology findings:

> **Q:     Do you think you're qualified to criticize Dr. Anderson's opinions as a neuroradiologist?**
>
> **A:     No, I do not believe I am qualified to** - -
>
> **Q:** Criticize?
>
> **A:** Yes.  Sorry.  Thank you.  I forgot the exact word you used.  - - **to criticize Mr. Anderson's MRI read**.

**Exhibit B,** Tubbs Deposition, 160:8-19.

Similarly, as a family practice physician, Dr. Tubbs is not qualified to proffer

causation opinions in the fields of neurology and neurosurgery.   *See Alexander*, 98

F.Supp.2d at 1315.  The impact of a delay in surgery involves the type of specialized

medical knowledge that only a specialist in the area of spine surgery can properly address.  Plaintiff has failed to establish that these specialties are within the reasonable confines of Dr. Tubbs' training and experience in family medicine.  Absent such proof, Dr. Tubbs' opinions are not admissible pursuant to Rule 702 and *Daubert*.

Furthermore, Dr. Tubbs' opinions that the delay in treatment caused Plaintiff's injuries are nothing more than *ipse dixit* assertions not grounded in any medical evidence.  *See* Doc. 217-2, ¶¶ 10, 19, 22.  Dr. Tubbs lacks the qualifications to render a reliable expert opinion in neurology or neurosurgery.  Despite his lack of qualifications, Dr. Tubbs opines that the Defendant Nurses alleged failure to appropriately treat Ms. Trujillo *caused* her injuries.  During the timeframe between the alleged occurrence of Plaintiff's injury and her spinal fusion, she was examined by two neurologists on separate occasions, who did not recommend immediate surgery.  *See, e.g.,* Statement of Undisputed Fact 24, 30, Nurse MSJ, Doc. 211, pp. 7-9.  Plaintiff subsequently underwent a second MRI in May 2013 that showed that there were no significant changes since October 2012 MRI.  **Exhibit C,** Andersen Report.  Moreover, Plaintiff's surgeon testified that, even if she had cervical surgery in October 2012, she would probably have the same outcome.  *See* Doc. 211-32.

Even Dr. Tubbs acknowledges that it is speculation to say that an earlier surgery would have ameliorated Plaintiff's symptoms:

> **Dr. Tubbs:** Okay.  So a month goes by and you saw the neurologist, right?
>
> **Ms. Trujillo:** Right.
>
> **Dr. Tubbs:** And you saw him in September [2012].  What did he tell

you?

**Ms. Trujillo:** Nothing serious.  I think that if he would have allowed to have been on this matter at the time that I did see him **I [would] probably be more able to keep up with my two-year old grandson and be more normal had I been had that surgery done at that time**.

**Dr. Tubbs:** Okay, **but that is all speculation**.  I want to know what the neurologist told you when you saw him in September.

**Ms. Trujillo:** That nothing.

**Dr. Tubbs:** Did he tell you that something serious was going on or that this is not serious?

**Ms. Trujillo:** To me it felt like it was not serious to him.

Doc. 211-31, pp. 3-4 (emphasis added).  Thus, Dr. Tubbs' causation opinions directly contradict the medical evidence in the case, as well as his own prior assessment.  The fact that Dr. Tubbs' opinions must ignore the medical evidence in the case, in conjunction with Dr. Tubbs' lack of qualifications in neurology, demonstrates that his opinions are nothing more than an *ipse dixit* assertion of causation.

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co. v. Joiner*, 522 U.S. 136, 137 (1997).  Likewise, the Tenth Circuit has unequivocally held that "the *ipse dixit* of an expert, no matter how qualified he may be, is never enough to guarantee him a ticket to admissibility." *Graves v. Mazda Motor Corp.*, 405 Fed. Appx. 296, 300 (10th Cir. 2010)(*citing Kumho,* 526 U.S. at 157).  Plaintiff has no evidence that if cervical spine surgery had been performed sooner, she would have obtained a better health outcome.  Accordingly, Defendants

request the Court exclude Dr. Tubbs' causation opinions on the basis that he is not qualified to render such opinions, and as a consequence, his opinions are not reliable.

### C. DR. TUBBS' OPINIONS ARE NOT RELIABLE BECAUSE HE TESTIFIES THAT DEFENDANT NURSES SHOULD HAVE PROVIDED CARE OUTSIDE THEIR SCOPE OF PRACTICE.

Finally, Dr. Tubbs offers several criticisms that Defendant Nurses should have taken actions outside the scope of practice.  For example, he opines that they failed to **order** radiographic testing in a timely manner, failed to schedule, follow up on, or **evaluate** MRI results, and failed to timely **refer** Plaintiff to a neurosurgeon.  *See* Doc. 217-2, ¶¶ 12, 13, 16.  However, each of these actions is within the physician scope of practice, rather than that of a registered nurse, as Dr. Tubbs conceded during his deposition:

> **Q:** What is the general scope of a nurse's practice in correctional care in your experience, specifically with regard to jails?
>
> **A:** So nurses are required to make assessments. Nursing plans, care plans. Do vital signs. Do physical examinations and intake physicals. When patients come in to booking and they get an intake physical examination.  They can do assessments, and then report to a physician. They can obtain laboratory evaluations and do simple laboratory tests like urinalysis, blood draws, IVs, administer medication, follow physician and physician assistants direct medical orders, or take medical records.  Transcribe them.  I mean, the scope of nursing is vast. I ask my nurses to do a lot of different things.  **The one thing I don't ask them to do is diagnose**.
>
> **Q:** You –
>
> **A:** Or prescribe.
>
> **Q:** Okay.

**A:**   The function of a physician is to diagnose and prescribe. **The function of the nurse is to provide care that has been recommended by the medical doctor or a physician assistant**.

Doc. 211-29, pp. 19:11 – 20:17 (emphasis added).

Under *Daubert*, "any step that renders the analysis unreliable… renders the expert's testimony inadmissible." *Goebel v. Denver and Rio Grande Western R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003). In fulfilling its gatekeeping role, the trial court must "assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts." *Id.* at 991. To meet this standard, an expert's testimony must have "a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592.

An expert opinion that incorrectly applies the nursing scope of practice does not have a reliable basis in the knowledge and experience of the medical field. Here, Dr. Tubbs attempts to proffer expert opinions criticizing the Defendant Nurses for not performing tasks that are beyond their scope of practice. *Physicians* order MRIs. *Physicians* evaluate MRIs. *Physicians* make referrals to other specialists. While nurses may assist physicians in completing these tasks, they lack the authority to do so independently. Dr. Tubbs seeks to expand the scope of the practice of nursing through his criticisms of the Defendant Nurses. However, his unilateral expansion of nursing practice is not "generally accepted in the scientific community." *See Daubert*, 509 U.S. at 593-94. As a consequence, Defendants request the Court exclude the opinions set forth in Doc. 217-2, ¶¶ 12, 13 and 16.

## V.    NURSE GRAMETBAUR'S OPINIONS ARE NOT RELEVANT OR RELIEABLE.

### A. NURSE GRAMETBAUR IS NOT QUALIFIED TO OFFER OPINIONS ON CAUSATION OF SPINAL INJURY OR INTERPRETATION OF MRI RESULTS.

In her Declaration, Nurse Grametbaur opined that Plaintiff's symptoms were "definitely neurological in nature," that the MRI results were "grossly abnormal," and that Plaintiff's emergent symptoms "required urgent surgery."  *See* Doc. 217-1, ¶¶ 10, 21, 28.

Proposed expert testimony must fall within the reasonable confines of the witness's expertise."  *Conroy*, 707 F.3d at 1169.  Even the possession of a medical degree does not qualify a physician to testify regarding medical causation of spine-related ailments.  *Alexander*, 98 F.Supp.2d at 1315.  More so, possession of a nursing degree does not qualify Nurse Grametbaur to offer opinions that Plaintiff's symptoms were "definitely neurological" or that her condition "require urgent surgery."  Nurses are not qualified to diagnose or send patients to surgery.  Additionally, Nurse Grametbaur is not qualified to determine whether MRI results are "grossly abnormal."  Plaintiff has failed to offer any evidence to establish that such testimony falls within the reasonable confines of Nurse Grametbaur's education, training, or experience as a registered nurse.  Plaintiff bears the burden of establishing her expert's qualifications, *Ralston*, 275 F.3d at 970, n.4, and absent such showing, Nurse Grametbaur's opinions must be excluded.

### B. NURSE GRAMETBAUR'S OPINIONS REGARDING THE AVAILABILITY AND USE OF MEDICAL RECORDS ARE NOT RELIABLE.

Nurse Grametbaur offered opinions regarding the availability and use of medical records by the Defendant Nurses.   *See* Doc. 217-1, ¶¶ 9 (failure to perform full evaluation), 10 (failure to perform in-depth chart review), 11 (use of chronic charting), 13 (failure to request clinic notes), 14 (failure to request clinic notes), 16 (failure to request clinic notes), 17 (failure to request clinic notes).   However, Plaintiff has failed to present any expert testimony establishing how the alleged conduct, even if true, rises to the level of deliberate indifference rather than mere medical negligence.   *See Estelle*, 429 U.S. at 106 (medical malpractice alone is insufficient to establish an Eighth Amendment claim).

Despite Nurse Grametbaur's criticisms of the Defendant Nurses, there is no evidence that they failed to request clinic notes or that they failed to perform in-depth chart review.   Moreover, there is no evidence that use of chronic charting caused or contributed to Plaintiff's alleged injuries.   In contrast, the evidence shows Plaintiff was monitored in the infirmary where nurses and doctors were present and was transferred to see specialists at the Denver Health Medical Center on four occasions, and upon each instance the specialists elected to return her to the jail despite the opportunity to admit her to the hospital.

"[A]ny step that renders the analysis unreliable… renders the expert's testimony inadmissible."   *Goebel*, 346 F.3d at 992.   As part of its gatekeeping role, the trial court must assess the reasoning and methodology underpinning the expert's opinion.   *Id.* at 991.   If these are flawed, the testimony is not admissible.   Here, Nurse Grametbaur offers mere speculation as to intent or criminal law recklessness of the Defendant

Nurses. She commits the familiar logical leap from criticisms of the nursing notes to suspected policy or practice (with no reference to a policy or practice in evidence) and on to a conclusory statement of "deliberate indifference." This type of speculation must be excluded from any opinions she offers at trial.

### C. Nurse Grametbaur's Opinion Regarding Callous Indifference is Not Relevant or Reliable.

Although Nurse Grametbaur opined that "all medical providers" demonstrated a pervasive pattern of callous indifference to Plaintiff's medical condition, *see* Doc. 217-1, ¶ 23, she failed to support this opinion with any evidence establishing the mindset of the Defendant Nurses or their personal participation. In order to prevail on an Eight Amendment claim, Plaintiff is required to prove that each health care provider had a "sufficiently culpable state of mind," so as to be guilty of "subjective recklessness" in having "consciously disregard[ed]" the substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834, 839 (1994). In addition, Plaintiff must establish that each Defendant personally participated in the alleged wrongdoing. *See Grimsley v. McKay*, 93 F.3d 676, 679 (10th Cir. 1996); *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011)

Despite the requirement that Plaintiff prove each Defendant's subjective intent and personal participation, Nurse Grametbaur has no opinion about the mindset of the Defendant Nurses:

> **Q:     Do you have any opinions regarding the thought process of any of the nurses that you've been critical of with regard to the circumstances giving rise to this case?**

**MR. GRAY:** Object to form. You can answer if you understand.

**BY MR. SINGER:**
**Q:**    **Do you understand the question?**

**A:**    Yes, I believe I did. The only one note I had was note where there was a question of she was malingering. And I couldn't read the signature on that, so I believe it was a nurse's note.

           **…**

**Q:**    To follow up on my previous question, I had asked about the thought process of the nurses. And you referenced a note where you saw someone who you thought was a nurse describing possible malingering as an explanation for why Ms. Trujillo was presenting the way that she was presenting, correct?

**A:**    Correct.

**Q:**    **Do you have any other opinions about the subjective intent or thought process of any of the nurses in this case?**

 **MR. GRAY:** Object to form.

**THE WITNESS:** Other than nobody advocated, nobody did, you know, the appropriate assessments and stuff as far as what they were thinking, no. I know what they should have been thinking, but what they were thinking, I don't know.

**BY MR. SINGER:**
**Q:**    **You're not claiming to know what was going through their heads, correct?**

**A:**    **No**.

**Q:**    **You're not claiming that you knew -- you know what was going through these nurses' heads and that's a basis for your opinion, correct?**

**MR. GRAY:** Object to form. You can answer.

> **THE WITNESS:** As far as what they should have been thinking, what they should have been doing, **but as far as what they were actually thinking, no.**

Doc. 211-30, 101:8 – 103:23 (emphasis added).

In order to present a triable issue for her Eighth Amendment claim, Plaintiff must present evidence that each individual defendant acted with deliberate indifference to her condition. This means that Plaintiff must establish that each Defendant Nurse knew she faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999). Nurse Grametbaur offers no evidence whatsoever of subjective intent or recklessness on the part of the Defendant Nurses. She failed to identify any other evidence of an individual Defendant's subjective recklessness or indifference regarding serious medical needs.

Since Nurse Grametbaur failed to identify evidence establishing how the Defendant Nurses were individually deliberately indifferent to Plaintiff's medical condition, she has not provided sufficiently reliable evidence to support her opinion that they acted with "callous indifference." Before an expert's opinion is admissible, the trial court must "assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts." *Goebel,* 346 F.3d at 991. Nurse Grametbaur's opinion does not meet this standard because she offers no evidence to support her averment that the Defendant Nurses acted with callous indifference. Instead, Nurse Grametbaur's opinion rests solely upon her *ipse dixit* assertions. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing

data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 137.   Accordingly,

Defendants request the Court exclude Nurse Grametbaur's opinions that they

demonstrated a "pervasive pattern" of callous indifferent to Plaintiff's medical condition.

### D. NURSE GRAMETBAUR'S OPINION REGARDING "MALINGERING" IS NOT RELEVANT.

In her Declaration, Nurse Grametbaur stated that Dr. Crum's note and

assessment that Plaintiff may be "malingering" was unprofessional and inappropriate.

Doc. 217-1, ¶ 25.   During her deposition, Nurse Grametbaur admitted that she

incorrectly attributed Dr. Crum's note to a nurse.  Doc. 211-30, 101:8-19.   An expert's

opinion is not admissible when it does not have sufficient bearing on the issue at hand

to warrant a determination that it has relevant "fit."  *See Bitler*, 400 F.3d at 1234.

Evidence is relevant when it has any tendency to make the existence of a fact

that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence.  FED.R.EVID. 401.  Nurse Grametbaur's criticism

of Dr. Crum's note does not have any tendency to make Plaintiff's allegations against

the Defendant Nurses more or less probable.[1]  Accordingly, her "malingering" opinion

should be excluded at trial.

## VI. CONCLUSION.

Before expert testimony is admissible, the Court must first determine whether the

expert is qualified, and whether the proffered testimony is both relevant and reliable.

For the reasons explained above, certain opinions of Dr. Tubbs and Nurse Grametbaur

---

[1] Furthermore, Nurse Grametbaur has not offered any evidence to support her assertion that including a comment that a patient may be "malingering" in her chart creates bias among all care providers that is extremely damaging to the patient.

fail to meet this threshold for admissibility.  Accordingly, the Defendant Nurses request that the Court limit Plaintiff's expert testimony as set forth herein.

WHEREFORE, the Nurse Defendants respectfully request that the Court grant their motion to limit the expert testimony of Dr. Tubbs and Nurse Grametbaur, and for such further relief as the Court deems equitable and just.

Dated: August 31, 2017

*/s Patrick A. Singer*
Patrick A. Singer, 39738
Kresl & Johnson, P.C.
130 Rampart Way, Ste. 200
Denver, CO 80230
Phone: (303) 336-2100
Fax: (303) 388-1749
psinger@kresljohnson.com
*Counsel of record for Defendants,*
*A. Perez, RN; V. Toliver, R.N.; and*
*Dana Wimberly, RN*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of August, 2017, a true and correct copy of the foregoing was filed to the Court and served by CM/ECF to the following:

J. Lee Gray
Kathleen K. Custer
Jessica J. Smith
Tina Van Bockern
Holland & Hart, LLP
Attorneys for Plaintiff

Conor D. Farley
Cristina Pena Helm
Denver City Attorney's Office, Litigation Section
Attorneys for Defendant,
City and County of Denver

*/s Patrick A. Singer*
Patrick A. Singer